## GOMILLION et al. v. LIGHTFOOT, MAYOR OF TUSKEGEE, et al.

No. 32.  Argued October 18–19, 1960.—Decided November 14, 1960.

*Fred D. Gray* and *Robert L. Carter* argued the cause for petitioners.  With them on the brief was *Arthur D. Shores.*

*Philip Elman* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Tyler, Daniel M. Friedman, Harold H. Greene, D. Robert Owen* and *J. Harold Flannery, Jr.*

*James J. Carter* argued the cause for respondents. With him on the brief were *Thomas B. Hill, Jr.* and *Harry D. Raymon.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This litigation challenges the validity, under the United States Constitution, of Local Act No. 140, passed by the Legislature of Alabama in 1957, redefining the boundaries of the City of Tuskegee. Petitioners, Negro citizens of Alabama who were, at the time of this redistricting measure, residents of the City of Tuskegee, brought an action in the United States District Court for the Middle District of Alabama for a declaratory judgment that Act 140 is unconstitutional, and for an injunction to restrain the Mayor and officers of Tuskegee and the officials of Macon County, Alabama, from enforcing the Act against them and other Negroes similarly situated. Petitioners' claim is that enforcement of the statute, which alters the shape of Tuskegee from a square to an uncouth twenty-eight-sided figure, will constitute a discrimination against them in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution and will deny them the right to vote in defiance of the Fifteenth Amendment.

The respondents moved for dismissal of the action for failure to state a claim upon which relief could be granted and for lack of jurisdiction of the District Court. The court granted the motion, stating, "This Court has no control over, no supervision over, and no power to change any boundaries of municipal corporations fixed by a duly

convened and elected legislative body, acting for the people in the State of Alabama." 167 F. Supp. 405, 410. On appeal, the Court of Appeals for the Fifth Circuit, affirmed the judgment, one judge dissenting. 270 F. 2d 594. We brought the case here since serious questions were raised concerning the power of a State over its municipalities in relation to the Fourteenth and Fifteenth Amendments. 362 U. S. 916.

At this stage of the litigation we are not concerned with the truth of the allegations, that is, the ability of petitioners to sustain their allegations by proof. The sole question is whether the allegations entitle them to make good on their claim that they are being denied rights under the United States Constitution. The complaint, charging that Act 140 is a device to disenfranchise Negro citizens, alleges the following facts: Prior to Act 140 the City of Tuskegee was square in shape; the Act transformed it into a strangely irregular twenty-eight-sided figure as indicated in the diagram appended to this opinion. The essential inevitable effect of this redefinition of Tuskegee's boundaries is to remove from the city all save only four or five of its 400 Negro voters while not removing a single white voter or resident. The result of the Act is to deprive the Negro petitioners discriminatorily of the benefits of residence in Tuskegee, including, *inter alia,* the right to vote in municipal elections.

These allegations, if proven, would abundantly establish that Act 140 was not an ordinary geographic redistricting measure even within familiar abuses of gerrymandering. If these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote.

It is difficult to appreciate what stands in the way of adjudging a statute having this inevitable effect invalid in light of the principles by which this Court must judge, and uniformly has judged, statutes that, howsoever speciously defined, obviously discriminate against colored citizens. "The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Lane* v. *Wilson,* 307 U. S. 268, 275.

The complaint amply alleges a claim of racial discrimination. Against this claim the respondents have never suggested, either in their brief or in oral argument, any countervailing municipal function which Act 140 is designed to serve. The respondents invoke generalities expressing the State's unrestricted power—unlimited, that is, by the United States Constitution—to establish, destroy, or reorganize by contraction or expansion its political subdivisions, to wit, cities, counties, and other local units. We freely recognize the breadth and importance of this aspect of the State's political power. To exalt this power into an absolute is to misconceive the reach and rule of this Court's decisions in the leading case of *Hunter* v. *Pittsburgh,* 207 U. S. 161, and related cases relied upon by respondents.

The *Hunter* case involved a claim by citizens of Allegheny, Pennsylvania, that the General Assembly of that State could not direct a consolidation of their city and Pittsburgh over the objection of a majority of the Allegheny voters. It was alleged that while Allegheny already had made numerous civic improvements, Pittsburgh was only then planning to undertake such improvements, and that the annexation would therefore greatly increase the tax burden on Allegheny residents. All that the case held was (1) that there is no implied contract between a city and its residents that their taxes will be spent solely for the benefit of that city, and (2) that a citizen of one municipality is not de-

prived of property without due process of law by being subjected to increased tax burdens as a result of the consolidation of his city with another. Related cases, upon which the respondents also rely, such as *Trenton* v. *New Jersey,* 262 U. S. 182; *Pawhuska* v. *Pawhuska Oil Co.,* 250 U. S. 394; and *Laramie County* v. *Albany County,* 92 U. S. 307, are far off the mark. They are authority only for the principle that no constitutionally protected contractual obligation arises between a State and its subordinate governmental entities solely as a result of their relationship.

In short, the cases that have come before this Court regarding legislation by States dealing with their political subdivisions fall into two classes: (1) those in which it is claimed that the State, by virtue of the prohibition against impairment of the obligation of contract (Art. I, § 10) and of the Due Process Clause of the Fourteenth Amendment, is without power to extinguish, or alter the boundaries of, an existing municipality; and (2) in which it is claimed that the State has no power to change the identity of a municipality whereby citizens of a pre-existing municipality suffer serious economic disadvantage.

Neither of these claims is supported by such a specific limitation upon State power as confines the States under the Fifteenth Amendment. As to the first category, it is obvious that the creation of municipalities—clearly a political act—does not come within the conception of a contract under the *Dartmouth College* case. 4 Wheat. 518. As to the second, if one principle clearly emerges from the numerous decisions of this Court dealing with taxation it is that the Due Process Clause affords no immunity against mere inequalities in tax burdens, nor does it afford protection against their increase as an indirect consequence of a State's exercise of its political powers.

Particularly in dealing with claims under broad provisions of the Constitution, which derive content by an

interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts. Thus, a correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.

The *Hunter* opinion itself intimates that a state legislature may not be omnipotent even as to the disposition of some types of property owned by municipal corporations, 207 U. S., at 178–181. Further, other cases in this Court have refused to allow a State to abolish a municipality, or alter its boundaries, or merge it with another city, without preserving to the creditors of the old city some effective recourse for the collection of debts owed them. *Shapleigh* v. *San Angelo,* 167 U. S. 646; *Mobile* v. *Watson,* 116 U. S. 289; *Mount Pleasant* v. *Beckwith,* 100 U. S. 514; *Broughton* v. *Pensacola,* 93 U. S. 266. For example, in *Mobile* v. *Watson* the Court said:

"Where the resource for the payment of the bonds of a municipal corporation is the power of taxation existing when the bonds were issued, any law which withdraws or limits the taxing power and leaves no adequate means for the payment of the bonds is forbidden by the Constitution of the United States, and is null and void." *Mobile* v. *Watson, supra,* 116 U. S., at 305.

This line of authority conclusively shows that the Court has never acknowledged that the States have power to do as they will with municipal corporations regardless of consequences. Legislative control of municipalities, no less than other state power, lies within the scope of rele-

vant limitations imposed by the United States Constitution. The observation in *Graham* v. *Folsom,* 200 U. S. 248, 253, becomes relevant: "The power of the State to alter or destroy its corporations is not greater than the power of the State to repeal its legislation." In that case, which involved the attempt by state officials to evade the collection of taxes to discharge the obligations of an extinguished township, Mr. Justice McKenna, writing for the Court, went on to point out, with reference to the *Mount Pleasant* and *Mobile* cases:

> "It was argued in those cases, as it is argued in this, that such alteration or destruction of the subordinate governmental divisions was a proper exercise of legislative power, to which creditors had to submit. The argument did not prevail. It was answered, as we now answer it, that such power, extensive though it is, is met and overcome by the provision of the Constitution of the United States which forbids a State from passing any law impairing the obligation of contracts. . . ." 200 U. S., at 253–254.

If all this is so in regard to the constitutional protection of contracts, it should be equally true that, to paraphrase, such power, extensive though it is, is met and overcome by the Fifteenth Amendment to the Constitution of the United States, which forbids a State from passing any law which deprives a citizen of his vote because of his race. The opposite conclusion, urged upon us by respondents, would sanction the achievement by a State of any impairment of voting rights whatever so long as it was cloaked in the garb of the realignment of political subdivisions. "It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Frost & Frost Trucking Co.* v. *Railroad Commission of California,* 271 U. S. 583, 594.

The respondents find another barrier to the trial of this case in *Colegrove* v. *Green,* 328 U. S. 549. In that case the Court passed on an Illinois law governing the arrangement of congressional districts within that State. The complaint rested upon the disparity of population between the different districts which rendered the effectiveness of each individual's vote in some districts far less than in others. This disparity came to pass solely through shifts in population between 1901, when Illinois organized its congressional districts, and 1946, when the complaint was lodged. During this entire period elections were held under the districting scheme devised in 1901. The Court affirmed the dismissal of the complaint on the ground that it presented a subject not meet for adjudication.* The decisive facts in this case, which at this stage must be taken as proved, are wholly different from the considerations found controlling in *Colegrove.*

That case involved a complaint of discriminatory apportionment of congressional districts. The appellants in *Colegrove* complained only of a dilution of the strength of their votes as a result of legislative inaction over a course of many years. The petitioners here complain that affirmative legislative action deprives them of their votes and the consequent advantages that the ballot affords. When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment. In no case involving unequal weight in voting distribution that has come before the Court did the decision sanction a differentiation on racial lines whereby approval was given to unequivocal withdrawal of the vote solely from colored citizens. Apart from all else, these considerations lift this

---

*Soon after the decision in the *Colegrove* case, Governor Dwight H. Green of Illinois in his 1947 biennial message to the legislature recommended a reapportionment. The legislature immediately responded, Ill. Sess. Laws 1947, p. 879, and in 1951 redistricted again. Ill. Sess. Laws 1951, p. 1924.

controversy out of the so-called "political" arena and into the conventional sphere of constitutional litigation.

In sum, as Mr. Justice Holmes remarked, when dealing with a related situation, in *Nixon* v. *Herndon*, 273 U. S. 536, 540, "Of course the petition concerns political action," but "The objection that the subject matter of the suit is political is little more than a play upon words." A statute which is alleged to have worked unconstitutional deprivations of petitioners' rights is not immune to attack simply because the mechanism employed by the legislature is a redefinition of municipal boundaries. According to the allegations here made, the Alabama Legislature has not merely redrawn the Tuskegee city limits with incidental inconvenience to the petitioners; it is more accurate to say that it has deprived the petitioners of the municipal franchise and consequent rights and to that end it has incidentally changed the city's boundaries. While in form this is merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights. That was not *Colegrove* v. *Green*.

When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. This principle has had many applications. It has long been recognized in cases which have prohibited a State from exploiting a power acknowledged to be absolute in an isolated context to justify the imposition of an "unconstitutional condition." What the Court has said in those cases is equally applicable here, *viz.*, that "Acts generally lawful may become unlawful when done to accomplish an unlawful end, *United States* v. *Reading Co.*, 226 U. S. 324, 357, and a constitutional power cannot be used by way of condition to attain an

unconstitutional result." *Western Union Telegraph Co.* v. *Foster,* 247 U. S. 105, 114. The petitioners are entitled to prove their allegations at trial.

For these reasons, the principal conclusions of the District Court and the Court of Appeals are clearly erroneous and the decision below must be

*Reversed.*

MR. JUSTICE DOUGLAS, while joining the opinion of the Court, adheres to the dissents in *Colegrove* v. *Green,* 328 U. S. 549, and *South* v. *Peters,* 339 U. S. 276.

## APPENDIX TO OPINION OF THE COURT.

CHART SHOWING TUSKEGEE, ALABAMA, BEFORE AND AFTER ACT 140

(The entire area of the square comprised the City prior to Act 140. The irregular black-bordered figure within the square represents the post-enactment city.)

Mr. Justice Whittaker, concurring.

I concur in the Court's judgment, but not in the whole of its opinion. It seems to me that the decision should be rested not on the Fifteenth Amendment, but rather on the Equal Protection Clause of the Fourteenth Amendment to the Constitution. I am doubtful that the averments of the complaint, taken for present purposes to be true, show a purpose by Act No. 140 to abridge petitioners' "right . . . to vote," in the Fifteenth Amendment sense. It seems to me that the "right . . . to vote" that is guaranteed by the Fifteenth Amendment is but the same right to vote as is enjoyed by all others within the same election precinct, ward or other political division. And, inasmuch as no one has the right to vote in a political division, or in a local election concerning only an area in which he does not reside, it would seem to follow that one's right to vote in Division A is not abridged by a redistricting that places his residence in Division B *if* he there enjoys the same voting privileges as all others in that Division, even though the redistricting was done by the State for the purpose of placing a racial group of citizens in Division B rather than A.

But it does seem clear to me that accomplishment of a State's purpose—to use the Court's phrase—of "fencing Negro citizens out of" Division A and into Division B is an unlawful segregation of races of citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment, *Brown* v. *Board of Education,* 347 U. S. 483; *Cooper* v. *Aaron,* 358 U. S. 1; and, as stated, I would think the decision should be rested on that ground—which, incidentally, clearly would not involve, just as the cited cases did not involve, the *Colegrove* problem.