**FAIRVIEW PUBLIC UTILITY DISTRICT NUMBER ONE, William E. Moore, Fern Williams, Glenn H. Eagon, Al Otter, and Pauline Truex, Appellants,**

v.

**CITY OF ANCHORAGE, a municipal corporation, Appellee.**

**Lawrence HAWK et al., Appellants,**

v.

**FAIRVIEW PUBLIC UTILITY DISTRICT NUMBER ONE et al., and City of Anchorage, a municipal corporation, Appellees.**

Nos. 69, 71.

Supreme Court of Alaska.

Feb. 2, 1962.

Pauline Truex, in pro. per.

Leonard Grau, in pro. per.

Richard O. Gantz, City Atty., Anchorage, for appellees.

Before NESBETT, Chief Justice, and DIMOND and AREND, Justices.

DIMOND, Justice.

These appeals concern the validity of the annexation of the Fairview Public Utility District to the City of Anchorage.

Following a constitutional directive[1], the legislature in 1959 established a Local Boundary Commission.[2] It was authorized to consider and recommend to the legislature any proposed local government boundary change, which would become effective no later than the end of the legislative session unless disapproved by a resolution concurred in by a majority of the members of each house.[3]

In 1960 the Commission presented to the legislature its recommendation that the Fairview Public Utility District, an area entirely surrounded by the City of Anchorage, be annexed to the city.[4] The House passed its concurrent resolution disapproving the proposed boundary change.[5] The Senate, however, refused to concur in the resolution of disapproval.[6] This meant, in the language of the constitution and the statute, that the annexation became "effective" by the end of the legislative session, if not earlier.[7]

Following the adjournment of the legislature, the city commenced this action for a declaratory judgment. It asked the court to determine that the District had been dissolved, that the city was the legal successor to all assets of the District, and that a date be set for winding up all affairs of the District and transferring its assets to the city. The complaint also sought to restrain the District and its board of directors from incurring any further obligations without the city's written consent. The defense primarily relied upon was that the failure of the legislature to disapprove the Commission's recommendation for annexation could not effect the dissolution of the District, since a dissolution could be validly effected only by the consent of the voters within the District pursuant to an election held in accordance with statute.[8]

The court entered a summary judgment, holding that the District had been validly annexed to the city, and was dissolved as a matter of law at the time of annexation. The court determined that the city was the legal successor to the District—entitled to all of its assets and charged with its liabilities and governmental functions. A master was appointed to determine the assets and liabilities, and the District's board of directors was ordered, after such determination had been made, to pay the District's outstanding obligations and to transfer any remaining assets to the city.

1. Alaska Const. art. X, § 12.

2. SLA 1959, ch. 64, § 7 (§ 2A–1–7 ACLA Cum.Supp.1959).

3. Alaska Const. art. X, § 12; SLA 1959, ch. 185, § 2 (§ 16–7–2 ACLA Cum.Supp. 1959). The 1959 act was repealed and superseded by SLA 1960, ch. 45.

4. Local Boundary Committee, Proposed Boundary Change, Recommendation No. 2. 1960 Alaska House Journal 64–65.

5. House Concurrent Resolution No. 36, 1960 Alaska House Journal 477.

6. The resolution was indefinitely postponed by the Senate on March 18, 1960. 1960 Alaska Senate Journal 598.

7. In identical language both the constitution (Art. 10, § 12) and the statute then in effect (SLA 1959, ch. 185, § 1) provided that a proposed boundary change "shall become effective forty-five days after presentation or at the end of the session, whichever is earlier, unless disapproved by a resolution concurred in by a majority of the members of each house." It is not material in this case to decide whether the effective date of the change was earlier than March 29, the end of the legislative session.

8. Section 49–2–13 ACLA Cum.Supp.1957 allows the dissolution of public utility districts in various circumstances, one of which is when "the whole or the integral part of a district becomes annexed to a incorporated city." The procedure to be followed is that established for the dissolution of municipal corporations by § 16–1–5 ACLA 1949. That statute calls for an election and requires a plurality of three-fifths of the votes cast to effect dissolution.

■ It is difficult to determine what appellants specifically rely upon as error. The statement of points on appeal, required by Supreme Court Rule 9(e), merely says in broad terms that the appellants "intend to rely upon" the Fourteenth and Fifteenth Amendments to the federal constitution, and upon the Supreme Court's decision in Gomillion v. Lightfoot.[9] Such a statement does not serve the purpose of the rule, for it fails to inform the opposing party and the court of matters we shall be called upon to decide.

The appellants' brief is not particularly enlightening, because it does not contain a specification of errors as required by rule.[10] It poses five questions under the heading "Issues Presented"[11], but certain of those questions are beyond the issues properly presented to us for decision. Because of this, we consider it important at the outset to state explicitly what is before us for review and what is not.

In the first place, we are not required to decide whether the court had the authority to appoint a receiver for the District. If one had been appointed, there would be a question as to the propriety of such action.[12] But the court did not appoint a receiver; instead it appointed a master. He was not to exercise any governmental function of the District, but was authorized only to make investigations, find facts, and make reports to the court. This was within the proper scope of a master's functions and powers as provided by rule.[13]

Neither are we obliged to determine whether the statutes pertaining to the dissolution of a public utility district are still valid and in force. The court below held that the District had been dissolved as a matter of law when annexation took place, and that this occurred when the legislature failed to disapprove the Commission's recommendation for annexation. It was unnecessary for the court to decide whether dissolution might also have been effected under the election procedure provided by statute.[14] The question is therefore not before us, and we express no opinion concerning it.

From an examination of the remaining "issues presented", the statement of points, and the argument in the brief, we believe that there are three questions appropriately before us for decision: (1) whether the Boundary Commission could validly exercise the powers conferred upon it; (2) whether the District was dissolved when annexed to the city; and (3) whether the annexation and dissolution of the District, effected without the consent of the voters within the District, deprived the appellants of any rights protected by the Fourteenth

---

9. 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

10. Supreme Ct.R. 11(a) (6) provides in part that the appellant's brief shall contain "[a] specification of errors relied upon which shall be numbered and shall set out separately and particularly each error intended to be urged. * * * When findings are specified as error, the specification shall state as particularly as may be wherein the findings of fact and conclusions of law are alleged to be erroneous."

11. These read as follows:
1. Was the purported annexation of the Fairview Public Utility District, Number One, to the City of Anchorage legal and in accordance with law?
2. Did the Court have the authority to appoint a receiver for the Fairview Public Utility District?
3. Did the City have the authority to commence municipal proceedings without an election showing consent by the people of the area affected?
4. Did the City of Anchorage have the authority to encumber the real and personal property of the people in the Fairview Public Utility District, without their consent?
5. Are the statutes pertaining to the dissolution of any Public Utility District valid and in force?

12. In Wood v. Gray, No. 41, 359 P.2d 951, 955 (Alaska 1961), we held that the court did not have authority to appoint a receiver for a public utility district.

13. Civ.R. 53.

14. Section 49–2–13 ACLA Cum.Supp.1957, supra note 8.

and Fifteenth Amendments to the federal constitution.

■ The first question has to do with Article X of the state constitution. Its purpose, as stated in Section 1, is to provide for maximum local self-government with a minimum of local government units, and to prevent duplication of tax-levying jurisdictions. In Section 2 it is stated that all local government powers shall be vested in boroughs and cities. The sections that follow provide for the establishment of organized and unorganized boroughs, for the incorporation and government of cities, and for the relationships that are to exist between these two units of self-government. Section 12 calls for the establishment of a local boundary commission, and defines the powers it is to have. The last section provides that special service districts existing at the time a borough is organized shall be integrated with the government of the borough as provided by law.

From these provisions appellants argue that the Local Boundary Commission was not intended to function as it did here until such time as boroughs had been established and necessary legislation had been enacted for integration of existing special service districts with borough government. It would be only after those events had taken place, appellants contend, that the Boundary Commission could consider and present to the legislature proposed local government boundary changes. In the intervening period, a boundary change resulting from annexation of a special service district to a city could be accomplished only by the petition-election procedure provided by a law enacted prior to the effective date of the constitution.[15]

That construction of Article X is neither required by the plain language of the constitution nor suggested by the proceedings of the constitutional convention. Section 12 says that a local boundary commission shall be established by law in the executive branch of the state government, that it may consider any proposed local government boundary change, and that it may present proposed changes to the legislature. It does not say that these things were not to take place until certain other events had occurred, such as the establishment of boroughs.

The convention proceedings militate against the position adopted by appellants. Article X was drafted and submitted by the Committee on Local Government, which held a series of 31 meetings between November 15 and December 19, 1955. An examination of the relevant minutes of those meetings shows clearly the concept that was in mind when the local boundary commission section was being considered: that local political decisions do not usually create proper boundaries and that boundaries should be established at the state level.[16] The advantage of the method proposed, in the words of the committee—

> * * * lies in placing the process at a level where area-wide or state-wide needs can be taken into account. By placing authority in this third-party, arguments for and against boundary change can be analyzed objectively.[17]

This expressed need for state adjustment of local boundaries was of immediate concern, and not something that the delegates considered would arise only after a borough government had been formed.[18] Following

15. SLA 1957, ch. 183 (§§ 16–1–29–29n ACLA Cum.Supp.1957), as amended, SLA 1959, ch. 103 (§ 16–1–29h ACLA Cum.Supp.1959).

16. Alaska Constitutional Convention Minutes of Committee on Local Government, Nov. 28 and Dec. 4, 1955. (This and all subsequent statements and quotes concerning proceedings of the Alaska Constitutional Convention refer to Records of the Alaska Constitutional Convention, now in the custody of the Secretary of State, Juneau, Alaska.)

17. Alaska Constitutional Convention, Commentary on Proposed Article on Local Government, Dec. 19, 1955 at 6.

18. Alaska Const. art. X, § 3, states in the first sentence "The entire State shall

World War II the City of Anchorage, the largest municipality in Alaska, experienced such a rapid growth that it soon outgrew its boundaries, and the population of adjacent and contiguous areas became greater than that of the city. This resulted in efforts by the city to annex a number of these heavily populated and unincorporated areas. Those efforts were met by the most determined opposition. In a 1954 case involving the attempted annexation of adjacent territory, Judge Folta remarked:

> "Every impediment and dilatory tactic has been employed by the opponents of annexation, except the homesteaders, to obstruct and harass the city in every move in connection with its efforts to extend its boundaries in the traditional manner to include the adjacent areas. Such opposition does not appear to be in the public interest or in good faith.[19]

In 1955 there were petitions for the annexation of three additional areas adjacent to the city. Again there were protests and concerted opposition, which required determination by the Territorial District Court. In his written opinion Judge Folta commented on the history of the growth of urban areas, and the deficiencies in existing procedures for annexation. He said:

> "The areas sought to be annexed are a part of one compact, urban community comprising the metropolitan area of Anchorage, and, except for the invisible corporate boundaries, are a part of the city's social and economic existence. The real boundaries extend away beyond the corporate boundaries. Moreover, not only do the streets of the city extend through these areas, but they bear the names originally given

them by the city and the areas themselves are indistinguishable from that part of the city adjacent thereto. The opposition in part is traceable to the failure of the city during the boom to extend its facilities and services into the areas as they developed. This delay resulted in the extension of privately owned utilities and the organization of public utility districts. The situation is such that the annexation law appears to be inadequate, and gerrymandering, or the appearance thereof, would appear to be excusable in attempting to cope with it; otherwise it may well develop that several municipalities will be carved out of this one community, each with a government of its own, resulting in a multiplication of facilities and services, increased tax burdens, and inevitable jurisdictional conflict and chaos. Henrico County, Windsor Farms, Inc. v. City of Richmond, 177 Va. 754, 760, 15 S.E.2d 309. The Court is not going to lend itself to the imposition of a hydra-headed government on the people of a single urban area unless it has no alternative under the law." [20]

Rejecting the arguments in opposition, the court ordered an annexation election "so that the people may determine for themselves whether the City of Anchorage is to be allowed to expand in the traditional manner or be put in a strait jacket." [21]

■ We cannot assume that when the delegates to the constitutional convention assembled later in 1955, they were unaware of these obstacles faced by Alaska's cities. We cannot assume that they were insensitive to the inadequacies inherent in a system where needed municipal expansion

---

be divided into boroughs, organized or unorganized." It was not until 1961 that the legislature enacted a statute providing for the establishment of boroughs. SLA 1961, ch. 146 effective Oct. 1, 1961.

19. Annexation to the City of Anchorage, 15 Alaska 67, 69, 128 F.Supp. 717, 718 (D.Alaska 1954).

20. In re Annexation to City of Anchorage, 15 Alaska 504, 509, 129 F.Supp. 551, 554 (D.Alaska 1955).

21. Id. at 510 (129 F.Supp. at 554).

could be frustrated if the electors in a single urban area outside of municipal boundaries did not agree to annexation.[22] In the light of these contemporary realities, we cannot assume that the adjustment of local boundaries at a state level was intended to be delayed pending the formation of boroughs. We must assume that the convention would have used specific language to accomplish that result. We hold that the method for making boundary changes, contemplated by Article X, Section 12 of the constitution, was operative upon the enactment of the 1959 statutes creating a Local Boundary Commission[23] and conferring powers upon it.[24]

■ Appellants contend that the District was not dissolved when annexation took place; that this could be accomplished only by the election procedure set forth by statute.[25] We disagree. This would defeat the chief purpose of annexation, which was to do away with two separate governments in a single community, and thus avoid multiplication of facilities and services, duplication of tax burdens, and inevitable jurisdictional conflict and chaos.[26] When annexation was effected the District was extinguished, and its property, powers and duties were then vested in the city.[27]

Our conclusion is not refuted by a 1957 statute which provides for dissolution with consent of the voters when "the whole or the integral part of a district becomes annexed to an incorporated city."[28] This has application only where annexation takes place under the petition-election procedure[29] which was the only means of annexation in effect prior to the time the state constitution became effective.[30] It has no application where annexation takes place under the different method established by Article X, section 12 of the constitution.

Appellants next contend that their constitutional rights were violated when they were not permitted to hold an election and vote as to whether annexation should take place. They rely specifically on the due process clause of the Fourteenth Amendment, and on the Fifteenth Amendment as applied in the recent case of Gomillion v. Lightfoot.[31]

■■ Appellants do not point out, nor do we perceive, in what respect there has been a deprivation of "liberty, or property, without due process of law."[32] The determination of what portions of a state shall be within the limits of a city involves an aspect of the broad political power of the state which has always been considered a most usual and ordinary subject of legislation.[33] The state may permit residents of local communities to determine annexation questions at an election. But when this has been done, the state is not irrevocably committed to that arrangement. If the citizens of the state, in adopting a constitu-

22. In 1955 a proposal for annexation would be defeated if at least fifty-five percent of the votes cast in the area sought to be annexed were not in favor of the proposal. SLA 1951, ch. 7, § 2. In 1957 this was changed to fifty percent. SLA 1957, ch. 183, § 10 (§ 16–1–29i ACLA Cum.Supp.1957).

23. SLA 1959, ch. 64, § 7 (§ 2A–1–7 ACLA Cum.Supp.1959).

24. SLA 1959, ch. 185 (§ 16–7–2 ACLA Cum.Supp.1959).

25. Section 49–2–13 ACLA Cum.Supp.1957, supra note 8.

26. In re Annexation to City of Anchorage, 15 Alaska 504, 509, 129 F.Supp. 551, 554 (D.Alaska 1955).

27. In re Sanitary Board of East Fruitvale Sanitary Dist., 158 Cal. 453, 111 P. 368, 370 (1910); Dickson v. City of Carlsbad, 119 Cal.App.2d 809, 260 P.2d 226 (1953).

28. SLA 1957, ch. 130 (§ 49–2–13, First, ACLA Cum.Supp.1957).

29. SLA 1957, ch. 183 (§§ 16–1–29–29n ACLA Cum.Supp.1957).

30. The state constitution went into effect on January 3, 1959.

31. 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

32. U.S.Const. amend. XIV, § 1.

33. Kelly v. City of Pittsburgh, 104 U.S. 78, 81, 26 L.Ed. 658, 659 (1881); 1 Antieau, Municipal Corporation Law § 1.15 at 30 (1958).

tion, decide that it is in the public interest to establish another election procedure, there is no constitutional obstacle to that course of action. Those who reside or own property in the area to be annexed have no vested right to insist that annexation take place only with their consent. The subject of expansion of municipal boundaries is legitimately the concern of the state as a whole, and not just that of the local community.[34] There has been no infringement or deprivation of rights protected by the Fourteenth Amendment.

The Fifteenth Amendment and the Supreme Court's decision in the Gomillion[35] case are not pertinent. They are concerned with the denial of a citizen's right to vote because of his race or color. That factor is not involved in this case.

■ In a companion case (No. 71) a number of residents of the District commenced an action against the District and its board of directors to compel the latter, by mandatory injunction, to hold an election in order that new directors could be elected—the terms of the others having expired. The City of Anchorage moved to intervene, claiming that because the District had been annexed to the city and thus dissolved by operation of law, no purpose could be served by the election of new directors who would have no functions to perform. The court dismissed the action, holding that its decision in the prior action brought by the City for a declaratory judgment was controlling.

What we have said above as to the validity and effect of the annexation of the Fairview District to the City of Anchorage disposes of this second appeal. There would be no sense in requiring the election of a board of directors for a public utility district which no longer was in existence.

The judgments are affirmed.

34. Cf. Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907); Mount Pleasant v. Beckwith, 100 U.S. 514, 524–525, 25 L.Ed. 699, 701 (1880).

35. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).