Earl Benjamin BUSH et al., Plaintiffs,

v.

ORLEANS PARISH SCHOOL BOARD et al., Defendants.

Civ. A. No. 3630.

United States District Court
E. D. Louisiana.

May 18, 1963.

A. P. Tureaud, Ernest N. Morial, New Orleans, La., James Nabrit, III, New York City, for plaintiffs and plaintiff intervenors.

Alvin J. Liska, Ernest L. Salatich, New Orleans, La., for City of New Orleans et al.

Samuel I. Rosenberg, New Orleans, La., for Orleans Parish School Board.

FRANK B. ELLIS, District Judge.

In this proceeding, Defendant, Orleans Parish School Board, seeks court approval of its long-range plan for the operation of the Orleans Parish Schools on a non-discriminatory basis. Plaintiffs in this class action make certain objections to the plan in the form of objections to the plan as presented and in the form of petitions for further relief.

In essence, the Board's plan establishes a single-zone school system for the first and second grades for the school year 1963–64 and one additional grade each year thereafter. This is accomplished by a single-zone map for the first and second grades. All other grades are to remain under the dual-zone system until the grade-a-year program reaches them. Every student in the first and second grades is given the right to attend the school in his or her attendance district. Transfers from the attendance district to a school outside the attendance district, when in writing by some person responsible for the child, will be given careful consideration and granted where good cause therefor is shown and when transfer is practicable, consistent with sound school administration. The Board re-tains the right to modify the attendance district lines whenever necessary for the most efficient and economic use of the school plant in the face of changing population patterns and conditions resulting from the building of new schools. Registration day is to be no later than June 6, 1963, for the first and second grades and the Board proposes to make public its registration procedures. Lastly the plan will not become effective until approved by this Court.

Plaintiffs' objections are numerous, but concisely stated, are:

1) The eleven-year delay in complete desegregation cannot be supported as an administrative necessity.

2) There is no provision for conversion to a single-zone system for the first five grades in 1964 as provided by the orders of the Fifth Circuit Court of Appeals.

3) There is no provision for lateral transfer of children in grades above the first and second grades out of dual school districts.

4) There is no protection against discrimination by routinely assigning children in the first and second grades to their new attendance zone.

5) There is no provision for relief of over-crowding of negro schools.

6) There is no provision for desegregation of the kindergarten.

7) There is no provision for non-racial admission to schools for exceptional children.

8) There is no provision for non-racial admission to vocational schools, summer schools and night school.

9) There is no provision for non-racial assignment of teachers.

10) There is no provision for building new schools without regard to race.

11) School districts may be changed by the Board without safeguards against discrimination.

██ Insofar as the Board's single-zone maps for attendance districts and its registration for the school year 1963–64 are concerned, a final approval is premature. The evidence indicates without doubt that attendance figures for the new single zones are "guesstimates". Witnesses for the Board made it clear that normal school practice is to set up attendance districts based on prior facts which are projected forward. After registration the zones are altered to adjust to the facts adduced at registration. This means that certain zones will be shaped differently than those presently shown on the single-zone maps. To this procedure plaintiffs cannot reasonably object and the court approves this much of the plan as a rational method of school administration. However, plaintiffs object that such a procedure without more is a latent tool of discrimination. Of course, the Board cannot expect final approval of what it terms an estimate at best. The presumption is that the Board will apply the attendance districts without regard to race. If, after registration and the alteration of the maps, it appears that the Board has "gerrymandered" the attendance districts so as to continue segregated schooling, the time will be ripe for the court to correct the situation. Courts are quite capable of dealing with discrimination by gerrymandering. Gomillion v. Lightfoot, 364 U.S. 339, 81 S. Ct. 125, 5 L.Ed.2d 110. Similarly, administration of a school board plan which does not achieve desegregation, but only leaves the pattern as before, is also within the competence of this court to correct. See Norwood v. Tucker, 8 Cir., 287 F.2d 798; Bush v. Orleans Parish School Board, 205 F.Supp. 893 aff'd in part, rev'd in part, 5 Cir., 308 F.2d 491. But the facts do not yet indicate any such discrimination and the evidence presently before the court is insufficient. What facts there are indicate that the Board will treat all students even-handedly. After extensive testimony and intensive interrogation by the Court it is established that every child in the first and second grade will be routinely assigned to the school in his attendance district on the single-zone map unless he actively, of his own volition, chooses another school. This is supported by Section 5 of the Board's plan which indicates that the method for attending a school outside one's school district will be by *transfer*. Hence, having confected zone lines on non-racial considerations, the Board will assign all children to the school in his or her attendance zone and permit a child to leave an attendance zone only through transfers. The Board also indicates that it has not determined the criteria for transfer. It is presumed that whatever they are, they will be non-racial. Some well-established guidelines can be mentioned. Transfer provisions must be applied to white and negro even-handedly. The fact that one's race is in the minority is not a grounds for transfer since it is based on race. Boson v. Rippy, 5 Cir., 285 F.2d 43; Dillard v. School Board of City of Charlottesville, 4 Cir., 308 F.2d 920. The bases for a requested transfer must be consonant with sound school administration. The Board indicates that its transfer program will concern itself with the efficient use of the school plant as well as the maximum freedom of choice among the students. The record indicates that freedom of transfer is the traditional policy of the Board within administrative limits. This being the case, within the limits of the broad outline aforementioned, this Court will leave the Board to its own devices with the clear understanding that the plaintiffs may request further relief at any time. Other than that, this Court need not say more. Needless to say if the Board acts differently than it has indicated the Court is open to the plaintiffs and the Court has made provision for this in its order. To this extent then the Board's single-zone plans are approved insofar as registration no later than June 6, 1963, is concerned.

██ Plaintiffs' objections (1), (2) and (3) deal specifically with defendant's long-range plan. Plaintiffs point out that the Board did not provide for trans-

fers in the second and third grades for 1962–1963 and argue that the Court of Appeals intended that there be "an additional measure of desegregation." Bush v. Orleans Parish School Board, 5 Cir., supra at 502 of 308 F.2d. Hence they argue those children who would have had an opportunity to attend a desegregated school under the original May 16, 1960, order will forever be denied that right. Additionally, plaintiffs seek the total desegregation of the Orleans Parish Schools in 1963–1964, or, in the alternative, the right of lateral transfer above the single-zone grades one and two. The Board argues that the problems involved in converting a dual zone into a single-zone system are momentous. The record shows that since its earliest inception the school system in New Orleans has been run on a dual system based on race. Consequently the existing school plants often are within a block of each other since each school separately served the white and negro children of the area. Moreover the Board has been engaged in a massive building program to meet the ever-increasing number of educables in the Parish. Clearly the Board has adequately borne the burden of excusing itself from desegregating the total school system this year. Secondly, a program of lateral transfer compounds the problem. Now that the elimination of the dual-zone system is a reality the need for stop-gap measures such as lateral transfers is not so critical. Moreover it does not practically fit into the present plan for desegregation.

 In the original opinion, The Fifth Circuit ordered the desegregation of the first five grades by 1964. On rehearing, the court emphasized that, considering the altered attitude of the Board, the long-range plan of the Board might alter the then existing court-approved plans. In addition, the Fifth Circuit observed that "[u]nfortunately, at this moment in this case there is too large a gap between logic and experience." Bush v. Orleans Parish School Board, 5 Cir., supra at 501. Somewhat the same situation obtains at present.

The Board's plans to adopt the single-zone system in the first and second grades is not based on true experience. Until the single-zone system is put into effect, it will be impossible to determine its precise effect. Hence it is premature to make definitive decisions on the long-range plan. That decision will be pretermitted until the results of the single-zone system can be evaluated in the light of at least some actual experience. It is, of course, to be understood that the Board will not be heard to say that it does not have time to plan for the school year 1964 as it has done in the past. The Board is fully aware of the orders of this Court and the Fifth Circuit. The only decision made here is that final acceptance and approval of the long-range plan is not yet feasible. Desegregation will proceed in 1964—but at what pace it cannot yet be said. Plaintiffs are in no way prejudiced since they can, as in the past, seek further relief. The Board will not be released from its duty since it will be required to report to this Court as soon as pertinent facts are available, at which time further orders will issue.

 As this Court appreciates the decision of the Fifth Circuit, the prime concern were those children who, under the orders of this Court on May 16, 1960, and thereafter, sought to exercise the right to attend a˙desegregated school and, through the inaction of the Board or the unconstitutional application of the Louisiana Pupil Placement Law LSA–R.S. 17:101 et seq., were denied that right. The Court of Appeals found, and this Court agrees, that such children deserve special consideration. As was noted before, the freedom of choice principal seems more consonant with sound school administration. Although ostensibly given free choice, these children were in fact denied free choice. Consequently, this Court will order that those children who have made application to the Board for admission to previously all-white schools under the May 16, 1960 order of this Court, and those subsequent orders, may elect to transfer laterally to formerly all-white schools even

though those children may now be in the third and fourth grades. The test, of course, is whether the child has already sought application. If the child has already had to run the gauntlet of the Louisiana Pupil Placement Act, he or she need not face it again. Moreover the Board will be required to personally contact each of these applicants who was rejected of this right. The court recognizes that this is something of a burden on the Board. However, it is slight indeed when compared to the administrative burden which would result from ordering a single-zone system for the first five grades without any practical experience gained from the first and second grades' desegregation effective this fall. Moreover, it will give that "additional measure of desegregation" required by the Fifth Circuit's August 6th order.

 Plaintiffs' Objection No. 4 with regard to discriminatory assignment is demonstratively dispelled by the evidence in the case. It has been made clear to the Court that the Board intends to assign children automatically to their attendance district as set out on the single-zone maps unless they choose to go elsewhere, in which event they will have to apply for a transfer under procedures to be set down by the Board. It is well to remember that Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, requires "desegregation" not "integration". The term "integration" has no legal significance in this context. School Board of City of Charlottesville v. Allen, 4 Cir., 240 F.2d 59; Rippy v. Borders, 5 Cir., 250 F.2d 690. Neighborhood patterns being what they are, the existence of an all-white or all-negro school even under the single-zone system is not prima facie discriminatory. Any attempt to achieve such a result by gerrymandering school districts will be dealt with summarily by this Court. But as of now, the evidence does not support any such suggestion.

Plaintiffs' Objection No. 5 relates to over-crowding negro schools as opposed to under-capacity white schools. The record reflects that the Louisiana State Board of Education's required maximum for class size is 35. In the negro schools 62.6% of the classes have more than 35 students as of 1962. The average class size was 36.9. In the white schools, 11.-11% of the classes have more than 35 students, and the average class size is 30.1. Testimony indicated that there had been difficulty in getting accreditation for negro schools because of the class loads. The same was true, but to a less degree in white schools.

The following statistics indicate the extent of the efforts of the Board to alleviate the problem of overcrowding, and the extent of the problem itself:

A. TEACHERS – (See Exhibit P3, Page 54)

| | White | Negro |
|---|---|---|
| 1962–63 | 1582 | 1897 |
| 1951–52 | 1307 | 839 |
| Increase | 275 | 1058 |
| Estimated Addition 1963–64 | – 0 – | 126 |

B. NEW CONSTRUCTION SINCE 1952 (Exhibit P–9)

| | | |
|---|---|---|
| White | $15,253,266 | 35.45% |
| Negro | 27,770,091 | 64.55% |
| Total | $43,023,357 | 100.00% |

Converted from dollars into number of additional pupil accommodations we have the following:

**C. ADDITIONAL ACCOMMODATIONS FOR NEGRO PUPILS PROVIDED IN THE PAST TEN YEARS (EXHIBIT OPSB–43)**

| | |
|---|---|
| New Buildings | 24,348 pupils |
| Conversions | 6,488 " |
| Total | 30,836 pupils |

**D. ADDITIONAL PUPIL ACCOMMODATIONS TO BE PROVIDED BY NEW SCHOOLS UNDER CONSTRUCTION AND NEW PROJECTS FOR WHICH ARCHITECTS HAVE BEEN NAMED IN PREDOMINANTLY NEGRO NEIGHBORHOODS (EXHIBIT OPSB–43)**

| | |
|---|---|
| Under construction | 3,474 pupils |
| Architects named | 4,245 " |
| Total | 7,719 pupils |

**E. DECREASE IN PLATOONING (Exhibit P–3, Page 17)**

| | |
|---|---|
| October, 1961 | 5,540 pupils |
| October, 1962 | 3,343 " |
| January, 1963 | 646 " |
| Estimate September, 1963 | – 0 – " |

**F. INCREASE IN AVERAGE DAILY MEMBERSHIP (Based on Registration) (Exhibit P–3, Page 21, and OPSB–43)**

| | White | % of Total | Negro | % of Total |
|---|---|---|---|---|
| 1962–63 | 38,728 | 39.6% | 59,223 | 60.4% |
| 1952–53 | 34,760 | 52.8% | 31,031 | 47.2% |
| Increase (Decrease) in ten years | 3,968 | (13.2%) | 28,192 | 13.2% |

Over-crowding, with its consequent watering down of educational quality, that is caused by racial discrimination, is difficult to countenance. As this Court said in an earlier opinion, "there is nothing to suggest that a school board could constitutionally continue separate but equal facilities under the umbrella of the 'deliberate speed' rule when it is admitted that negroes are living relatively near white schools which are below capacity." Bush v. Orleans Parish School Board, E.D.La., supra at 896 of 205 F.Supp. The statistics above indicate the lengths to which the Board has gone to eliminate over-crowding. The imminence of the end of over-crowding convinces this Court that equity does not demand the alteration of a single-zone approach presently before this Court. Also, the harsh, practical realities of running a school system must be ever with the Board which has problems other than desegregation. Once a plan has been approved that looks to total desegregation and once the Board shows by performance that inequality in opportunity is being phased out, this Court, within its discretion, will leave the Board pretty much alone, although under its watchful eye, lest the Board return to its former practices. Based, then, on the facts in evidence, the Court will deny further relief based on the allegation of over-

crowding since it does not find the allegation so substantial as to warrant any drastic change from the Court-approved methods of desegregation.

■ Plaintiffs' Objection No. 6 is that no provision has been made for desegregation of the kindergarten. State law does not require kindergarten in its compulsory attendance law. The Board operates a kindergarten, however, out of available moneys. The program is comprised of two half-day sessions. It is presently operated on a segregated basis. The record indicates that the maximum acceptable size for a kindergarten is 30 pupils. The average class size for white pupils is 25. The average class size for negroes is 32. In negro classes, 61.3% of the classes are over 30 pupils. In the white schools 15.5% of the classes have more than 30 pupils. Registration for the 1963–64 school year in the kindergarten is completed but the figures have not been compiled. When they are completed they will be turned over to this Court for such further orders as it deems necessary. Insofar as the desegregation of the whole kindergarten is concerned, there is little logic in skipping kindergarten and proceeding with desegregation from the first grade level. In this respect plaintiffs' petition is well-founded. The testimony on this hearing proves one point beyond peradventure. Transfer from a dual to a single-zone system in the City of New Orleans is an arduous administrative task. The plaintiffs bring this particular request for further relief rather late in the day and it is inconceivable that total desegregation of the kindergarten could be achieved this fall. Plaintiffs concede as much. Moreover, this Court is averse to mixing approaches to the long-range plan. There is an attractive finality to a single-zone system which commends itself to sound school administration. Hence this Court will not order desegregation of the kindergarten until the school year, 1964–65, and the Board will be ordered to proceed with studies to that end.

Plaintiffs' Objections Nos. 7 and 8 are directed to the failure of the Board's plan to provide for admission of negroes to certain specialty schools, in particular the Delgado Trades School and the Benjamin Franklin High School.

■ The Delgado Trades School is a school of specialized trade instruction operated by the State of Louisiana. The Board has an arrangement whereby it recommends students to the Delgado Trade School. One member of the Orleans Parish School Board is an ex officio member of the Delgado board. As plaintiffs envision it, this Court will order the Orleans Parish School Board to send negro students to Delgado. The testimony indicates that Delgado does not admit negroes. The Delgado Trades School is not before this Court. An injunction against the Board will achieve nothing towards gaining admission of negroes to Delgado. Broad though this Court's equity powers may be, they do not extend to parties not before it and to doing a vain and useless thing. Moreover, plaintiffs well know they have an adequate remedy elsewhere. See East Baton Rouge Parish School Board v. Davis, 5 Cir., 287 F.2d 380; Louisiana State Board of Education v. Allen, 5 Cir., 287 F.2d 32; Louisiana State Board of Education v. Angel, 5 Cir., 287 F.2d 33.

■ The Benjamin Franklin School presents quite another question. This is a high school operated by the Orleans Parish School Board for especially gifted children, preparing them for college. For admission to the school a child must have a minimum I.Q. of 120 and, for the tenth grade, score at or about the fiftieth percentile in the achievement test administered, as well as have certain academic credits from the ninth grade. The school draws its enrollment from the City as a whole without regard to attendance zones. It is operated solely for white children. The Fifth Circuit has specifically suggested that desegregation of the Franklin school represents an opportunity for transitional desegregation. Bush v. Orleans Parish School Board,

5 Cir., supra, at 500 of 308 F.2d. So long as this Court does not require the Franklin school to lower its high academic standards and since administrative problems like those involved in transition from a dual to a single-zone are not involved, there is no good reason why the Franklin school should not be open to negroes who can meet and maintain its high standards. Consequently this Court will order that the Board accept applications on a non-racial basis for the Benjamin Franklin High School for the school year 1963–1964.

 Plaintiffs' Objection No. 9 is directed to the absence of provisions in the long-range plans for desegregation of the teaching staff. In this regard the language of the Fifth Circuit is appropriate:

> "In the exercise of its discretion, however, the district court may well decide to postpone the consideration and determination of that question (teacher desegregation) until the desegregation of the pupils has either been accomplished or has made substantial progress." Augustus v. Board of Public Instruction, 5 Cir., 306 F.2d 862, 869.

It must be realized that the specifics of long-range plans must be kept to a minimum. Operation of public schools, the record demonstrates, is inevitably a year-by-year operation when it comes to desegregation. This Court will confirm a long-range plan but additions are always a possibility as the Board and the community adjust to the new realities. Administratively the plaintiffs' petition is premature. It will not be denied but pretermitted until the Board overcomes some of the many serious problems involved in the conversion to a single-zone system. In accordance with the Fifth Circuit's emphatic recognition of this Court's discretion, this Court will not order immediate desegregation of the teaching staff.

 Plaintiffs' Objection No. 10 is that there is no provision for building new school plants on a desegregated basis. The record does not substantially support the charge and it is somewhat difficult to understand. Testimony was elicited that schools are built where students are. In addition, with single zones, the particular location of the school building becomes of much less importance. Furthermore, as this Court pointed out before, neighborhood patterns may constitutionally result in an all-white school or all-negro school. This Court does not find sufficient evidence to support a charge that the Court should take over the Board's capital program and distribute the school sites. Finally, plaintiffs make serious complaint about over-crowding. The fact that so many new schools have been built in negro areas must surely be a response to that complaint. Plaintiffs cannot have it both ways. The Court finds no merit in Plaintiffs' Objection No. 10.

As the length of the hearing and these findings indicate, the epic struggles are over. Now the Court and the Parties must solve the knotty administrative problems referred to by the Supreme Court. The long history of a dual school system and the rapid increase in educables compounds the problem at every step. Generally, so long as the Board indicates good faith and honesty in the administration of its plans, the Court will leave the public school system to those who know it best. It will, from time to time, issue further orders to deal with specifics. The record at this stage convinces this Court that the plan for desegregation is proceeding with all deliberate speed—faster and slower than some would wish, but generally in the best interests of the parties and the community.