**Peggy J. CONNOR et al., Plaintiffs,**

v.

**Paul B. JOHNSON et al., Defendants.**

**Civ. A. No. 3830.**

United States District Court
S. D. Mississippi,
Jackson Division.

Sept. 30, 1966.

See also D.C., 265 F.Supp. 492.

Alvin J. Bronstein, Jackson, Miss., and Peter Marcuse, Waterbury, Conn., R. Jess Brown, Jackson, Miss., for plaintiffs.

Joe T. Patterson, Atty. Gen. of Mississippi, and Martin R. McLendon, Asst. Atty. Gen., Jackson, Miss., for defendants.

Before COLEMAN, Circuit Judge, and WILLIAM HAROLD COX and DAN M. RUSSELL, District Judges.

## PER CURIAM:

### I

As a result of the decennial census of 1960 and pursuant to the Act of Congress of June 18, 1929, 46 Stat. 21–27, as amended by the Act of November 15, 1941, 55 Stat. 761, 2 U.S.C.A., Section 2a, the number of Representatives in Congress to which the State of Mississippi is entitled was reduced from six to five. For Mississippi this was the third reduction in thirty years. Forty years ago, Mississippi had 8 Representatives in Congress, Florida had 4, and California had 13. Mississippi now has five, Florida 12, and California 38.

The first loss followed the census of 1930. In 1932, after long and acrimonious battle, it appeared that the Legislature would never agree on any redistricting plan and that the seven Representatives would have to be elected from the State at Large. Many candidates began their statewide campaigns. At the last minute, the matter was settled by combining the Seventh and Eighth Districts, eliminating Representative James W. Collier, of Vicksburg, from Congress, just as he was about to become Chairman of the Committee on Ways and Means. Even so, the controversy was carried to the Supreme Court in Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131, but the new districts were not disturbed.

Following the census of 1950, Mississippi lost another Representative. After the same reluctance and inability to agree that had existed in 1932, the Legislature ultimately resolved the matter by combining the First and Fourth Districts. This ended the Congressional career of Representative John E. Rankin.

Upon the third loss, the problem of redistricting kept the Legislature in an uproar for the major portion of its 1962 regular session. Eventually, the Second and Third Districts were combined. This resulted in the elimination of Representative Frank E. Smith from the Congress. It was this 1962 Congressional Reapportionment which was changed in 1966 by House Bill 911, now

under attack. It will be borne in mind that House Bill 911 was, in effect, the direct result of the suit now *sub judice*.

II

On October 19, 1965, the Mississippi Freedom Democratic Party, an organization composed almost entirely of Negroes, joined by other Plaintiffs, instituted this action for reapportionment of the Five Congressional Districts within the State of Mississippi. It was charged, and admitted, that in 1965 the population of the respective Districts was as follows:

First District, (old first and fourth) 364,962.

Second District, (old second and third) 608,041.

Third District, (old seventh and eighth) 460,100.

Fourth District, 295,072.

Fifth District, 449,565.

The complaint particularly charged that *"Each of the Congressional Districts should contain 435,628 persons, to be apportioned on a strict population basis"*.

Before this Court was assembled to hear the matter, the Legislature enacted, and on April 7, 1966, the Acting Governor approved, House Bill No. 911, Laws of Mississippi of 1966, reapportioning the five Congressional Districts. This was not accomplished, however, until after the Legislative histories of 1932, 1952, and 1962 had, in large measure, repeated themselves.

As recast by House Bill No. 911, the five districts will hereafter contain the following population as of the 1960 census:

First District, 15 counties, 449,361.
Second District, 20 counties, 427,468.
Third District, 12 counties, 428,447.
Fourth District, 19 counties, 423,300.
Fifth District, 16 counties, 449,565.
                82          2,178,141

It will thus be seen that the population ratio between the largest district and the smallest district is 1.062 to 1. The heaviest variation from the population norm of 435,628 (the figure demanded by Plaintiffs) is only 3.20% above in the Fifth District. This District is surrounded on three sides by the Alabama boundary, the Gulf of Mexico, and the Louisiana boundary, leaving very little manuevering room in which to meet the norm with perfect mathematical exactness. The extremely low variation in the remaining four districts is as follows:

First District, 3.15% above the norm;

Second District, 1.87% below the norm;

Third District, 1.65% below the norm;

Fourth District, 2.83% below the norm.

Although Plaintiffs had originally demanded that the State be redivided into five districts of 435,628 people each, and although the Legislature had almost achieved that objective to absolute perfection, Plaintiffs were not satisfied with House Bill No. 911. On July 12, 1966, they filed an amendment to the complaint, in which they attacked the statute on various grounds. The one most vigorously pressed is that the intent, purpose and necessary effect of the new plan will further be, in all likelihood, to deny the Mississippi Freedom Democratic Party and its Members and candidates a fair opportunity to vote and to elect [Negro] candidates to the United States House of Representatives from Mississippi. This contention was paraphrased in the further contention that the new Congressional lines in all likelihood, will delete and leave without meaningful representation a significant segment of the population, including the Plaintiffs and the class which they rep-

resent, meaning Negro citizens of the State. The defendants denied these new allegations.

The Court has heard the matter on its merits.[1]

The chief witness for the Plaintiffs was the Secretary of the Mississippi Freedom Democratic Party. His testimony was to the effect that the Plaintiffs feel that they are entitled to have at least one Congressional District of sufficient preponderance in Negro population to ensure the election of a Negro Representative from Mississippi.

By leave of the Court, both sides have filed briefs in support of their respective contentions.

In their brief, Plaintiffs make the following contentions, which we shall number as points for convenience of further reference.

(1) To be representative of the racial composition of the entire state, a Mississippi Congressional Delegation of five members would include two Negroes. The net effect of House Bill 911 is virtually to ensure that there will be no Negro Congressman from Mississippi for the next ten years;

(2) The Delta region of Mississippi contains eighteen counties, each of which has a population of more than fifty per cent Negro. It is a highly developed agricultural region. For these reasons it should have been included in a separate Congressional District;

(3) Only 32% of the eligible Negroes in Mississippi have registered as compared to twice that percentage of the white eligibles;

(4) The Legislature enacted House Bill No. 911 with the deliberate purpose of discriminating against the Negro population of the State;

(5) That the new Congressional Districts are not adequately co-extensive with the several geological and geographical regions of the State; and

(6) That House Bill No. 911 was, in fact, a racial gerrymander of the type and kind condemned in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

### III

We are of the view that the adjudication of this controversy is controlled by Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481:

376 U.S. at pages 7, 8, 84 S.Ct. at page 530.

"We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."

376 U.S. at page 14, 84 S.Ct. at page 533.

"It would defeat the principle solemnly embodied in the Great Compromise—equal representation in the House for equal numbers of people— for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others."

376 U.S. at page 17, 84 S.Ct. at page 535.

1. While the sole question before the Court was whether House Bill 911 of the Laws of Mississippi of 1966, as far as practicable, apportioned the State into Congressional Districts of equal population in compliance with Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, there were numerous objections raised by both sides as to the admission of certain items of evidence. Since we are here solely concerned with a Constitutional question of highest importance, rather than to have this opinion transformed into an exposition on the rules of evidence, we have decided to overrule all evidentiary objections and to admit all the evidence offered by either side, to receive such weight and consideration as its credibility, materiality, competency, and relevancy may justify, proceeding then to a determination of whether House Bill 911 does, or does not, comply with the Constitution of the United States.

"All elections ought to be equal. Elections are equal, when a given number of citizens, in one part of the state, choose as many representatives, as are chosen by the same number of citizens, in any other part of the state. In this manner, the proportion of the representatives and of the constituents will remain invariably the same."

376 U.S. at page 18, 84 S.Ct. at page 535.

"While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us."

■ It has thrice been held by three judge district courts, applying *Wesberry*, that one factor, and only one, may be taken into account in apportioning and establishing Congressional districts among the people of a state *and that factor is population*. Calkins v. Hare, D.C., 228 F.Supp. 824; Meeks v. Anderson, D.C., 229 F.Supp. 271 at page 273, and Bush v. Martin, D.C., 224 F.Supp. 499 at page 511, affirmed, sub nom. Martin v. Bush, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964).

Although it was a state legislative reapportionment case, Sims v. Frink, D.C., 208 F.Supp. 431, affirmed Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, gives further guidance. The Supreme Court said:

377 U.S. at page 559, 84 S.Ct. at page 1380.

"We determine that the constitutional test for the validity of congressional districting schemes was one of substantial equality of population among the various districts established by a state legislature for the election of members of the Federal House of Representatives."

In *Reynolds*, the Supreme Court further said:

"Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people not land or trees or pastures, vote."

■ House Bill No. 911, the product of numerous plans in both Houses of the Legislature, hammered out after a deadlock between the two, complies with the Constitution of the United States and constitutes a valid reapportionment of the five Congressional Districts within the State of Mississippi. We so find as a matter of fact and we so hold as a matter of law.

IV

In order that the Record may be complete and that there may be no doubt that the contentions of the Plaintiffs have thoroughly been considered, we make the following additional findings and comment on the points raised in Plaintiff's brief:

■ As to Point 1, suggesting that the Congressional Districts should have been so arranged as to ensure the election of at least two Negro Members of Congress, we have only to point to the unanswerable logic of what Mr. Justice Douglas said (dissenting opinion) on this subject in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, reh. den. 376 U.S. 959, 84 S.Ct. 964, 11 L.Ed.2d 977.

*Wesberry* and *Reynolds*, supra, in language already quoted, dispose of Point 2.

As to Point 3, we refer the parties to what Judge Wisdom said in Mississippi Freedom Democratic Party v. Democratic Party of State of Mississippi, 5 Cir., 362 F.2d 60, June 6, 1966.

■ As to Point 4, we find that Plaintiffs wholly failed their burden of proof. They proved that there were newspaper reports as to what a few legislators "thought" or said, but the

solemn acts of the Congress or of State legislatures may not be impeached or invalidated on nothing more than newspaper reports. Cf. Wright v. Rockefeller, supra.

The negative answer to Point 5 may be found in Wood v. Broom, supra, as well as in the Acts of Congress of June 18, 1929 and November 15, 1941, 46 Stat. 21–27, 55 Stat. 761, 2 U.S.C.A., Section 2a.

As to Point 6, *Gomillion* condemned an effort to take all but four or five of 400 Negro voters out of a municipality while not removing a single white voter, the objective to be accomplished by altering a square shaped city to one having 28 sides, Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). There are no such facts in this case. In other words, *Gomillion* is simply not apposite.

Reapportioning Mississippi into Congressional Districts being the difficult, almost impossible, task that it is, one may well recognize that the Legislature would have much preferred to forget the whole subject—in fact, would have done so had it not been for the compulsion of this suit. Under the law, requiring that the vote of one person shall have substantially the same weight as that of any other in the selection of any particular official or in the decision of any particular elective issue, the Plaintiffs had every right to institute this suit. When the suit was filed the Second District had a population of 608,-441. Obviously it would have to give up 172,813 people. The Second District had 360,780 Negroes and 247,661 white residents, a Negro majority of 113,119. The record is silent as to why the Members of the Mississippi Freedom Democratic Party wanted to attack this District. It presented a perfect set up for their aims and aspirations. They must have known that there was no place to send the 172,813 surplus but to the adjoining First and Fourth Districts. The Third and Fifth Districts already had more than their quota of population. So, the Legislature did what these Plaintiffs in effect forced it to do—it distributed the surplus to the two districts which needed it in order to strike the balance of equality. When this was done the old First District, of predominantly white population from the foundation of the State, wound up with a majority of Negro inhabitants, although small compared to that which formerly existed in the Second District.

The point is, however, that the balance in population among the five districts is as nearly perfect as 174 Legislators could ever be expected to agree . upon as a distribution among 82 counties and the vote of every citizen, of whatever race, will now weigh equally in the selection of Representatives in Congress.

The Court therefore finds and holds that as to the Reapportionment of the State of Mississippi for the election of Representatives in Congress the complaint should be and is dismissed at the cost of the Plaintiffs.

We have not overlooked the final contention that the Congressional Reapportionment is invalid because made by a Legislature which is invalidly apportioned. The Act was passed by the Regular 1966 Session of the Legislature elected in 1963 pursuant to laws then in effect and unchallenged. We are, therefore, not in position to entertain this particular attack.

There is another wing to this case, involving Reapportionment of the Legislature, in which the Legislature has been directed to reapportion. That aspect is yet pending, awaiting legislative response.

As to Congressional Reapportionment, the Judgment of the Court is now final.

That which has herein appeared shall constitute the findings of fact and conclusions of law in this case, and an order accordingly will be prepared and entered by the Court.