Frank E. MULLEN, Appellant,

v.

Charles CHRISTIANSEN, John Mitchell, Allen Panamaroff, Gust Reft, Jr., and Fred Katelnikoff, Appellees.

Charles CHRISTIANSEN, John Mitchell, Allen Panamaroff, Gust Reft, Jr., and Fred Katelnikoff, Appellants,

v.

Earl BLASER and Dorothy Blaser, Appellees.

Nos. 4891, 4986.

Supreme Court of Alaska.

April 9, 1982.

John W. Colver, Warren C. Colver & Associates, Anchorage, for appellant Frank E. Mullen.

John S. Hedland, James D. Grandjean, Hedland, Fleischer & Friedman, Anchorage, for appellees and appellants Charles Christiansen, John Mitchell, Allen Panamaroff, Gust Reft, Jr. and Fred Katelnikoff.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

In October 1975, Appellees Charles Christiansen, John Mitchell, Allen Panamaroff, Gust Reft, Jr., and Fred Katelnikoff [the Fishermen] brought suit to recover the price of approximately 100,000 pounds of fish they sold and delivered to Trans-Alaska Seafood Products [TASP], a partnership comprised of Raymond Ellis, Patrick Pletnikoff, Frank Mullen, Robert Bedwell, and Trans-Alaska Management Services Company, Inc. [TAMSCO]. In the suit, the Fishermen also named Mr. and Mrs. Earl Blaser as guarantors of the price of the fish.

At trial, the Fishermen argued that in late September 1975, they entered into an oral contract for the sale of fish with TASP through its agent, Pletnikoff. In the alternative, they argued that Pletnikoff was the ostensible agent of Mr. Blaser, who was the buyer of the fish. Mullen disputed the alleged contract between TASP and the Fishermen, as well as the existence and composition of TASP as a partnership at the time that contract was entered into.

After a three-week trial, the jury returned a special verdict in favor of the Fishermen, finding: (1) TASP, a partnership, existed in late September 1975, and had as its partners Pletnikoff, Ellis, Mullen, Bedwell and TAMSCO; (2) in dealing with the Fishermen, Pletnikoff acted on behalf of TASP; (3) TASP bought the fish from the Fishermen; and (4) the Blasers did not guarantee the Fishermen they would be paid for their fish. The court denied the Fishermen's motion for new trial against Mr. and Mrs. Blaser, as well as Mullen's

alternative motions for judgment notwithstanding the verdict, for new trial and for amendment of the judgments. Judgments entered for the Fishermen totaled approximately $72,400.00 in principal. Over Mullen's objection, the court granted the Fishermen's motion for attorney's fees in the amount of $26,809.00, the total amount billed by counsel. Mullen appeals from the judgments on the verdict and from the orders denying his post-trial motions. He also appeals from the order awarding the Fishermen prejudgment interest at eight per cent from September, 1975 and full attorney's fees. The Fishermen appeal from the judgment in favor of Mr. and Mrs. Blaser. The two appeals are consolidated.

For the reasons stated below, we affirm the trial court's denial of Mullen's motions for directed verdict and for judgment notwithstanding the verdict or new trial. On appeal, the Fishermen seek reversal of the decision in favor of Blaser only in the event we determine that as a matter of law the evidence shows Blaser, not TASP, was the buyer of the fish. Consequently, we do not reach their arguments.

In his brief, Mullen argues the trial court erred in awarding compensation for the claim of a non-party fisherman. We do not address this issue because Mullen failed to raise it in his points on appeal.[1] We reverse the trial court's order awarding prejudgment interest at eight per cent from September 1975, and full attorney's fees.

## I. Statement of Facts

In the summer of 1975 Mullen and Bedwell, residents of southern California, contacted Pletnikoff, an Alaska resident, to see if he knew anyone in Alaska in the fish business. Mullen knew a commodities broker, Blaser, who was interested in buying fish. At the time, Pletnikoff was a stockholder in TAMSCO, an Alaska corporation engaged in project management and grantsmanship. Ellis was president of the corporation. Pletnikoff took leave from his job on the pipeline and went to work for TAMSCO to locate fish. The four men exchanged ideas over the telephone about the formation of a company that would engage in the buying and selling of fish. In early August, Pletnikoff went to California to meet with Mullen and Bedwell.

During Pletnikoff's visit, the men negotiated an agreement to do business together as a partnership with the intent to later incorporate. Pletnikoff's duty to the partnership was to locate a source of fish. Ellis was to provide temporary office services. Mullen and Bedwell were to supply the buyer. Mullen, Bedwell and Pletnikoff signed a partnership agreement that Pletnikoff was to take to Alaska for Ellis' signature.[2]

While Pletnikoff was in California, the partners also entered into written agreements with Blaser that provided for "an exclusive right to sell" to Blaser all seafood products for one year and a "firm offer" of 30,000 fish—approximately 240,000 pounds of salmon—on or before August 30, 1975. Blaser was to establish a letter of credit at the First National Bank of Anchorage for the order of 30,000 fish.[3]

Mullen, Bedwell, Pletnikoff and Ellis held a partnership meeting by telephone a week after Pletnikoff returned to Alaska. They discussed amending the partnership agreement, but disagreed later about what they had decided during the meeting. Pletnikoff contacted fishermen he knew and in late August and early September he traveled to

---

**1.** Appellate Rule 210(e); *Armco Steel Corp. v. Isaacson Structural Steel Co.*, 611 P.2d 507, 519 (Alaska 1980); *Wetzler v. Wetzler*, 570 P.2d 741, 742 n.2 (Alaska 1977); *Saxton v. Splettstoezer*, 557 P.2d 1126, 1127 (Alaska 1976).

**2.** Conflicting evidence at trial showed that Ellis signed the agreement, signed a version of the agreement that he had amended, or simply did not sign the agreement. Evidence was presented to show that Pletnikoff consulted with Ellis by telephone during the negotiations and that

the agreement was prepared according to Pletnikoff's and Mullen's specifications.

**3.** Prior to the Karluk venture, discussed below, Ellis opened an account at the First National Bank of Anchorage in TASP's name. Mullen and Bedwell failed to sign the bank resolution authority, but they submitted signature cards in an attempt to complete the documentation required by the bank. Pletnikoff used this bank account while he was in Kodiak and Karluk.

several fishing villages with Blaser and Ellis in an attempt to locate fish. By mid-September, Pletnikoff had contacted many fishermen, but he had been unsuccessful in locating a source of fish for the partnership. Blaser was anxious to supply processed fish for his clients and on September 18, 1975, he went to Kodiak to meet Pletnikoff because it was rumored that the Department of Fish and Game might open fishing at Karluk.

In Kodiak, Pletnikoff talked with two of the Fishermen about the possibility of buying fish at Karluk. They reached a general understanding of what the price would be. After the Department of Fish and Game announced its decision to open fishing at Karluk, Pletnikoff secured the services of a boat tender to load the fish at Karluk Lagoon and arranged for a seafood processor to process the fish. He and Blaser flew to Karluk the afternoon before the opening of fishing.

At Karluk, Blaser and Pletnikoff first went to a party at the home of one of the Fishermen, where they engaged in casual conversation about fishing. A few hours later, the local fishermen held a meeting at the Co-op building, where they discussed offers made for the fish, including Pletnikoff's offer to pay two cents per pound over the other offers. Pletnikoff and the spokesmen for the Fishermen then met to discuss the details of the agreement.

During the negotiations, Pletnikoff and Blaser did not disclose the nature of their relationship. A few of the Fishermen had known Pletnikoff prior to this venture. They thought he represented a business firm, but they did not know the name of the firm or the names of its officers. They were sure he was not acting only on his own behalf. The Fishermen thought Pletnikoff and Blaser were working together in some type of business arrangement, but they did not know the particulars. Pletnikoff and Blaser represented to the Fishermen that they had letters of credit that would be available for the purchase of large quantities of fish. The negotiations were completed at about 8:00 p. m. The fishing began shortly thereafter at 12:01 a. m.

The Fishermen fished for four days and the boat tender took in 100,000 pounds of fish. The unloading of the fish at the processing plant was delayed and as a result 70,000 pounds of the fish had to be thrown overboard due to spoilage. The remaining 30,000 pounds of fish were sold pursuant to court order at this trial and the proceeds were disbursed by the court to the processor, the boat tender and the Fishermen. The Fishermen were awarded approximately $72,400.00 as damages under the contract.

## II. Mullen's Motions for Directed Verdict and for Judgment N.O.V. or New Trial

Mullen argues that the trial court erred in denying his motion for a directed verdict and his motion for judgment notwithstanding the verdict or in the alternative for a new trial. See generally Alaska R.Civ.P. 50 and 59.

██ In reviewing denial of motions for a directed verdict or judgment notwithstanding the verdict, this court is not to weigh conflicting evidence or judge the credibility of witnesses. Rather, it is to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts. *Levar v. Elkins*, 604 P.2d 602, 603–04 (Alaska 1980); *Alyeska Pipeline Service Company v. Aurora Air Service, Inc.*, 604 P.2d 1090, 1094 (Alaska 1979).

██ A motion for a new trial will be granted when the evidence to support the verdict is completely lacking or is so slight and unconvincing as to make the verdict plainly unreasonable and unjust. *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 724 (Alaska 1975); *Ahlstrom v. Cummings*, 388 P.2d 261, 262 (Alaska 1964). If there is an evidentiary basis for the jury's decision, denial of a new trial must be affirmed. *Olson v. McRae*, 389 P.2d 576, 577 (Alaska 1964). We will not interfere with the trial court's discretion except in the most exceptional circumstances and to prevent a miscarriage of justice. *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 222 (Alaska 1978).

■ We have reviewed the record and conclude that there was an evidentiary basis for the jury's decision, and that the verdict was not plainly unreasonable and unjust. Further, reasonable persons could differ in their judgment as to the facts. Thus the issues were properly submitted to the jury.

The evidence presented to prove that TASP existed as a partnership in late 1975 and that Mullen was a partner included the often conflicting testimony of the four partners about the formation of the partnership and its subsequent activities, the partnership agreement (including the "corrected" copy and three versions of the signature page), the written agreements with Blaser executed in the name of the partnership, the minutes of the telephone meeting and bank documents. Partnership agreements are interpreted according to the principles of contract law. *See generally* 1 Z. Cavitch, Business Organizations section 14.01 (1981). The jury could properly consider the language and conduct of the parties, the objects sought to be accomplished, and the circumstances surrounding the negotiation of the contract to determine whether the four men agreed to associate as partners.[4] We find that the evidence presented at trial was sufficient to support the jury's conclusion that TASP existed as a partnership and that Mullen was a partner at the time of the Karluk venture.

Conflicting evidence was presented as to whether Pletnikoff acted on behalf of TASP during the contract negotiations with the Fishermen. Pletnikoff testified that he did not know who he was working for when he negotiated the agreement, but he thought Mullen had an interest in the profits of the venture. The trip by Blaser and Pletnikoff to Kodiak just before the Karluk venture was similar to other trips they took around Alaska in search of fish pursuant to agreements between TASP and Blaser. Furthermore, Pletnikoff used the TASP bank account while he was in Kodiak and Karluk.

The testimony of the partners at trial was often self-serving, evasive and inconsistent. In its special verdict, the jury found that Pletnikoff was acting on behalf of TASP in his negotiations and that TASP was the buyer of the fish. We believe the question is a close one, turning upon the credibility of the witnesses. The jury had the opportunity to observe the witnesses and we accept its decision. *See Jackson v. White*, 556 P.2d 530, 532 n.4 (Alaska 1976).

Mullen argues the evidence was insufficient to show that TASP and the Fishermen mutually assented to a contract because, he contends, the uncontradicted testimony of the Fishermen showed that they intended to enter into a contract with Blaser, who negligently led them to believe that Pletnikoff was his agent. Mullen further argues that reasonable minds could not differ on this conclusion and the trial court erred in denying his motions for directed verdict and for judgment notwithstanding the verdict.

We do not agree. The evidence showed that the Fishermen thought Pletnikoff was acting on behalf of someone else, but they did not know the identity of the principal. They knew Blaser was somehow involved in the "company" Pletnikoff represented, but they were unsure of Blaser's role. The

---

4. In interpreting a contract, the objective is to give effect to the reasonable expectations of the parties. *Wright v. Vickaryous*, 598 P.2d 490, 497 (Alaska 1979). To ascertain the reasonable expectations of the parties, we look to the language of the disputed agreement, the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated. *Id.; Peterson v. Wirum*, 625 P.2d 866, 870 & n.7 (Alaska 1981). *See also Innes v. Beauchene*, 370 P.2d 174, 176 (Alaska 1962) (in the absence of a writing, the existence of a partnership may be proved by transactions, conduct and declarations).

The process of weighing the evidence of the circumstances surrounding the partnership agreement and resolving disputes pertaining to the parties' intent is for the trier of fact. *Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188, 1194 (Alaska 1975); *Day v. A & G Constr. Co.*, 528 P.2d 440, 443 (Alaska 1974). This rule is particularly applicable in this case because the jury's decision depended largely upon oral testimony and necessarily involved determining the credibility of the witnesses whose testimony conflicted. *See Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980).

evidence is sufficient to show that Pletnikoff acted on behalf of TASP in negotiating the contract. As a partially disclosed principal, TASP was a party to the contract made on its behalf by its agent who was acting within the apparent scope of his authority, unless the contract expressly excluded TASP.[5] The evidence that the Fishermen intended to enter into a contract with Blaser or with a "company" represented by Pletnikoff was subject to varying interpretations.[6] We conclude that the evidence presented to show that the Fishermen intended to enter into a contract with Pletnikoff's principal is sufficient to support the jury's determination that TASP was the buyer of the fish.

■ Mullen next argues the evidence was insufficient to show that TASP and the Fishermen mutually assented to a contract because Pletnikoff did not perceive himself as entering into a contract on behalf of TASP. This argument is without merit. The self-serving testimony of the parties as to their subjective intentions or understandings is not probative evidence of whether the parties entered into a contract or who the parties to the contract are. *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981); *Day v. A & G Construction Co.*, 528 P.2d 440, 444 (Alaska 1974). The jury could properly look to objective manifestations of Pletnikoff's intent to enter into a contract with the Fishermen on behalf of TASP and find that the contract was entered into on behalf of TASP. We conclude, therefore, that the trial court did not err in denying Mullen's motions for directed verdict and judgment notwithstanding the verdict or motion for new trial.

### III. Prejudgment Interest

Over Mullen's objection, the trial court awarded the Fishermen prejudgment interest at the rate of eight per cent per annum from September 25, 1975. At the time the money became due, the rate of interest in the state was six per cent. AS 45.45.010(a). The Fishermen agree with Mullen that the prejudgment interest awarded for the period prior to September 12, 1976, should have been at the rate of six per cent. *Drickersen v. Drickersen*, 604 P.2d 1082, 1087 (Alaska 1979). The Fishermen argue, however, that Mullen waived this issue by not raising it in his statement of points on appeal.

■ Ordinarily, we will not consider issues that are not included in the appellant's statement of points on appeal. *See* note 1 *supra*. If, however, the issue was raised at the trial and is adequately briefed on appeal and if opposing counsel are sufficiently apprised of the issue, we may consider it. *Hootch v. Alaska State-Operated School System*, 536 P.2d 793, 808 n.58 (Alaska 1975). Mullen adequately raised the issue before the trial court and briefed it on appeal. The Fishermen were able to prepare an adequate reply to this issue. We therefore conclude that the judgments

---

5. *See Maxwell's Elec., Inc. v. Hegeman-Harris Co. of Canada, Ltd.*, 567 P.2d 1149, 1152 (Wash.App.1977); Restatement (Second) of Agency section 186 (1958).

The Restatement (Second) of Agency section 4(2) (1958) provides the following definition of a partially disclosed principal, "If the other party has notice that the agent is or may be acting for a principal but has no notice of the principal's identity, the principal for whom the agent is acting is a partially disclosed principal." As a general rule, "[a] disclosed or partially disclosed principal is subject to liability upon contracts made by an agent acting within his authority if made in proper form and with the understanding that the principal is a party." Restatement (Second) of Agency section 144 (1958).

In *State v. Neal & Sons, Inc.*, 489 P.2d 1016, 1019 (Alaska 1971), we indicated that a third party acts at his peril when he knows the other is acting as an agent, but he fails to inquire into the extent of the agent's delegated authority. There is no similar rule regarding knowledge of the identity of the principal. 3 C.J.S. *Agency* section 412, at 259 (1973).

6. In reviewing the trial court's denial of Mullen's motions for directed verdict and for judgment notwithstanding the verdict, we must determine whether the evidence when viewed in the light most favorable to the Fishermen is such that reasonable minds could not differ on the outcome. It is not our task to weigh the evidence or to judge the credibility of the witnesses. If the evidence is susceptible to varying interpretations, the question is one for the jury. *Alyeska Pipeline Serv. Co. v. Aurora Air Serv., Inc.*, 604 P.2d 1090, 1094 (Alaska 1979); *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974).

should be amended to reflect prejudgment interest at the rate of six per cent from September 25, 1975, to September 12, 1976, and at the rate of eight per cent thereafter.

### IV. Attorney's Fees

A month after trial, counsel for the Fishermen stated in an affidavit that his firm had billed the Fishermen for attorney's fees in the amount of $26,809.00. Under Alaska Civil Rule 82, the trial court granted the Fishermen's motion for an award of attorney's fees in this amount.

 Civil Rule 82(a) outlines a schedule of attorney's fees to be awarded based on the money judgment recovered by the prevailing party. The purpose of Rule 82 is to "compensate a prevailing party only *partially* for attorney fees justifiably incurred." *Davis v. Hallett*, 587 P.2d 1170, 1171 (Alaska 1978) (emphasis in original). The award of full attorney's fees is "manifestly unreasonable" in the absence of a bad faith defense or vexatious conduct by the losing party. *Id.* at 1171–72. The trial court must state its reasons when it makes an award of attorney's fees that varies from the schedule in Rule 82(a). *Farnsworth v. Steiner*, 601 P.2d 266, 272 (Alaska 1979). The superior court did not explain its award of full attorney's fees. Because of this, it is necessary to remand the case. The court must either state its reasons for making an award that varies from the schedule set forth in Civil Rule 82(a) or adhere to that schedule.

The superior court's judgments are AFFIRMED as to all matters except the award of attorney's fees and prejudgment interest. These issues are REMANDED for further proceedings consistent with this opinion.

MATTHEWS, Justice, in which CONNOR, Justice, joins, concurring.

I agree with all of the majority opinion except that portion which declines to decide the propriety of the award to the non-party fisherman, Malutin, because Mullen did not raise that issue in his statement of points on appeal. The issue was raised in Mullen's opening brief and given distinct and adequate attention there. The appellees have not claimed prejudice by reason of Mullen's failure to express the issue in his statement of points on appeal. Where an issue is not set forth in a statement of points on appeal but is adequately argued and there is no prejudice this court has taken the position that the issue should be decided on the merits. *Putnam v. State*, 629 P.2d 35, 39 n.2 (Alaska 1980); *Hootch v. Alaska State-Operated School System*, 536 P.2d 793, 808 n.58 (Alaska 1975); *Torres v. State*, 519 P.2d 788, 793–94 (Alaska 1974); *Lapham v. Town of Haines*, 372 P.2d 376, 377 (Alaska 1962). *See also, Miller v. City of Fairbanks*, 509 P.2d 826, 829 (Alaska 1973); *Steward v. City of Anchorage*, 391 P.2d 730, 732 (Alaska 1964); *Fairview Public Utility District Number One v. City of Anchorage*, 368 P.2d 540, 542 (Alaska 1962). In my view, this position should be followed here. It comports with the policy that cases where possible be decided on the merits.[1] The only purpose of the statement of points on appeal required by Appellate Rule 210(e) is to inform the opposing party of the issues to be raised on the appeal so that those portions of the trial court record germane to such issues may be designated. *Steward v. City of Anchorage*, 391 P.2d at 732. Since there is here no claim that this purpose has been frustrated by appellants' failure there is no good reason not to consider the issue in question on the merits.

Turning to the merits, Mullen contends that the court erred in including in the Panamaroff claim some $6,500.00 due Malu-

1. *See, Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255, 1265 (1958); *Independent Productions Corp. v. Loew's Inc.*, 283 F.2d 730, 733 (2d Cir. 1960); *Zeller v. Poor*, 577 P.2d 695, 697 (Alaska 1978); *Champion Oil Co. v. Herbert*, 552 P.2d 670, 673 (Alaska 1976) (Boochever, J., Concurring Opinion); *Guard v. Benson*, 438 P.2d 219, 223 (Alaska 1968); *Mely v. Morris*, 409 P.2d 979, 982 (Alaska 1966); *Oaks v. Rojcewicz*, 409 P.2d 839, 843 (Alaska 1966); *Palzer v. Serv-U-Meat Co.*, 419 P.2d 201, 206–07 (Alaska 1966); *Sanuita v. Hedberg*, 404 P.2d 647, 651 (Alaska 1965).

tin. Mullen asserts that there was no evidence that Malutin had assigned his claim to Panamaroff. Factually this argument is without merit because the evidence shows that Malutin and Panamaroff entered into an agreement under which Panamaroff agreed to sell Malutin's fish in Panamaroff's name, collect for them and turn over the proceeds to Malutin. Thus, to use the language of Civil Rule 17(a), Panamaroff was "a party with whom or in whose name a contract has been made for the benefit of another" and as such he was authorized to "sue in his own name without joining with him the party for whose benefit the action is brought. . . ." The trial court, therefore, did not err in refusing to reduce Panamaroff's judgment by the amount which Panamaroff must remit to Malutin.