**HUSKY OIL N.P.R. OPERATIONS, INC., Appellant,**

v.

**SEA AIRMOTIVE, INC., d/b/a Seair, Appellee.**

**No. S–822.**

Supreme Court of Alaska.

Sept. 12, 1986.

Rehearing Denied Oct. 9, 1986.

Kenneth O. Jarvi, Kenneth O. Jarvi, Anchorage, for appellant.

Sanford M. Gibbs, Hagans, Brown & Gibbs, Anchorage, for appellee.

Before RABINOWITZ, C.J., BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

Between 1976 and 1981, Husky Oil NPR Operations, Inc. (Husky) and Sea Airmotive, Inc. (Seair) entered into a series of contracts. In 1981 Husky withheld payment of Seair invoices, claiming that Seair had not been billing according to the terms of the contracts. Seair filed a complaint against Husky. Husky denied Seair's claims and counterclaimed against Seair. The trial court denied Husky's motion for summary judgment and its post-trial motions for judgment notwithstanding the verdict (JNOV) or new trial. Judgment was entered for Seair on both claims pursuant to a jury verdict. Husky appeals. We reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

From 1975 through 1982 Husky was the exploration contract operator in Alaska for the United States Government. Husky oversaw, on the Government's behalf, oil exploration within the area formerly known as Naval Petroleum Reserve No. 4, now called National Petroleum Reserve Alaska (NPRA).

Seair is engaged in the air transportation business. It provides fixed wing air transportation service within the State of Alaska.

Between 1976 and 1981, Husky and Seair entered into a series of contracts. Under the contracts Seair was to provide flying services in support of Husky's operation on the NPRA. This involved flying passengers and cargo within the NPRA and to and from Anchorage and Fairbanks.

Two separate disputes arose from this series of contracts. The first dispute, arising from contracts TC–78–13, TC–80–8 and TC–81–1, involves a claim for payment of fuel charges. These contracts require Seair to provide its own fuel when flying outside of the NPRA. Under these contracts, Husky was to reimburse Seair for the actual cost of fuel obtained outside of the NPRA.

During the period of the contracts, Seair obtained fuel outside the NPRA and pursuant to the contract provision submitted invoices for reimbursement. Husky paid these invoices until 1982. In 1982 Husky performed an audit of the invoices. The audit brought into question Seair's billing practices. Specifically, Husky alleged that Seair had been billing Husky nearly 50¢ per gallon over the actual cost of the fuel. Thereafter Husky withheld invoice payments from Seair.

The second dispute turns on a provision in contract TC–81–6 for an "augmented crew" charge. The contract requires Seair to furnish all personnel required for flight operations. In addition to other contract rates, the contract contains a provision for "augmented crew daily rate." When Seair flew with a pilot and co-pilot, it billed Husky an extra $420 per day for an augmented crew. Husky protested the augmented crew charge, claiming that a co-pilot was to be provided as standard practice under the contract. Husky also claimed that the "augmented crew" charge applied only where Seair provided a second complete crew whose purpose was to extend the flying time of the aircraft. Husky stopped payment to Seair under the contract.

In response to Husky's actions, Seair filed a complaint against Husky, alleging that Husky owed Seair fuel charges in excess of $35,000 and augmented crew charges in excess of $135,000. Husky denied the claims and counterclaimed against Seair for fuel overcharges of $74,880.

Husky moved for summary judgment or partial summary judgment. After oral argument the motion was denied by Judge Mark C. Rowland. After presentation of evidence at a jury trial, Husky moved for a directed verdict. This motion was also denied.

The jury returned a general verdict against Husky on Seair's claim and awarded Seair the sum of $145,298.75 as damages. It found for Seair on Husky's counterclaim.

Husky filed a motion JNOV or, in the alternative, for a new trial. Husky also moved for a new trial based on newly discovered evidence. The trial court denied these motions and entered judgment for Seair on both claims pursuant to the jury award. Husky appeals.

## II. DID THE COURT ERRONEOUSLY DENY HUSKY SUMMARY JUDGMENT ON THE FUEL CHARGE ISSUE?

Husky argues that the trial court erred in denying its motion for summary judgment on the fuel charge issue.

A motion for summary judgment must be granted where the evidence before the court on the motion raises no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c). The proffered evidence is to be viewed in the light most favorable to the party opposing the motion. *Wilson v. Pollet*, 416 P.2d 381, 383–84 (Alaska 1966).

■ Here the summary judgment motion involves the interpretation of a contract term. Where interpretation of a contract term is in question, we independently determine whether the question should be treated as a matter of law or fact. We have stated that where "interpretation of written instrument turns on the acceptance of extrinsic evidence, the process of weighing such evidence should be for the trier of fact." *Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188, 1194 (Alaska 1975) (footnote omitted). Thus if the credibility of extrinsic evidence is in question, or more than one reasonable inference can be drawn from the extrinsic evidence, the issue is to be treated as a question of fact. Otherwise, it is to be treated as a matter of law.

The contracts in question provide that Seair is to purchase its own fuel when flying outside the NPRA, and that Husky is to reimburse Seair for the "actual cost" of the fuel. They also provide that an audit may be performed on all invoices and that payment of invoices will be subject to reduction for overpayments on preceding invoices.

Fuel purchase invoices received by Husky under these contracts indicated that fuel had been purchased from Gay Airways. An audit performed by Husky revealed the following facts:

1. Alfred Gay, president of Seair, owns 96% of the stock of Gay Airways.

2. Gay Airways has no fuel storage equipment, no trucks, and no personnel who handle fuel.

3. Gay Airways has no employees. It has not had any for years, nor does it have a payroll.

4. Gay Airways has no accounts receivable or accounts payable.

5. Gay Airways listed its income as "0" on its corporate return and did not list any income for the fuel Seair bought from it.

In its memorandum in opposition to summary judgment, Seair did not deny any of the above facts. It asserted, however, that Husky employees had given Seair advice on how to prepare the invoices which included a 50¢ per gallon charge by Gay Airways, and that Husky had paid the Gay Airways invoices without objection until the time of the audit.

### A. *The Meaning of "Actual Cost"*

Husky's consistent position has been that "actual cost" is simply the amount that someone pays for an item. Black's Law Dictionary (rev. 4th ed. 1968) defines "actual cost" as "[t]he actual price paid for goods by a party, in the case of a real *bona fide* purchase, and not the market value of the goods." *Id.* 54 (citation omitted).

Seair argues that in fact Husky had no reasonable expectations regarding the term. Its apparent position is that Husky's payment of the invoices until the time of the audit should determine the meaning of the term.

■ While a prior course of dealing is often relevant to the interpretation of a contract, Seair presented no evidence that Husky had any knowledge of the nature of the fuel purchase transactions.[1] Because Seair concealed the nature of the transactions by using Gay Airways' invoices, Seair's billings and Husky's payments do not establish a common basis of understanding. We therefore find Husky's payment of invoices prior to the audit irrelevant.

■ The undisputed evidence permits only one reasonable inference as to the meaning of the term "actual cost." Actual cost is the amount paid for an item. If Seair purchased fuel in good faith from a retail dealer, it was entitled to bill Husky what it paid the dealer. If Seair purchased fuel from a wholesaler, it was entitled to bill Husky what it paid the wholesaler.

### B. *The Nature of the Fuel Purchase Transaction*

■ Husky contends that Seair purchased fuel directly from a wholesaler (Chevron). Seair contends that it purchased fuel from a retail dealer (Gay Airways).

The undisputed facts leave some doubt as to the exact role of Gay Airways in these transactions. Husky concedes that fuel was purchased by Seair from Chevron in the name of Gay Airways. Viewing the evidence in the light most favorable to Seair, we must assume that Gay Airways played some role in the transactions.

Husky argues that the court should disregard the status of Gay Airways as a separate corporate entity and treat it as a mere instrumentality of Seair. In *Jackson v. General Electric Co.*, 514 P.2d 1170 (Alaska 1973), this court held that in the parent/subsidiary context a corporate entity might be disregarded "simply because the two corporations are so closely intertwined that they do not merit treatment as separate entities." *Id.* at 1173 (footnote omitted).

Seair suggests that because Gay Airways is not a subsidiary of Seair, the doctrine of corporate disregard is inapplicable. We disagree. It is true that we have never before applied the doctrine to "brother/sister" corporations, corporations sharing a common nucleus of shareholders. It is also true that the existence of a parent/subsidiary relationship can be an important factor in the decision to apply the doctrine. *Id.* at 1173. Nevertheless, we find that other factors demand the application of the doctrine here.

Money passed directly from Seair to Chevron. Fuel passed directly from Chevron to Seair. To the extent that Gay Airways acted at all, it acted on behalf of Seair. Gay Airways did not receive the 50¢ per gallon it supposedly charged to Seair, nor do its records indicate that any money is owing to it. Gay Airways acted as an alter ego of Seair in the fuel purchase transactions. Therefore, for purposes of this case, Seair purchased fuel at wholesale from Chevron.

---

1. In an affidavit supporting Seair's memorandum in opposition to summary judgment, Alfred Gay, president of Seair, states: "Husky's employees and representatives knew of the manner in which Contract TC–78–13 and other contracts for the supply of fuel were being interpreted by [Seair] at the inception of the contract." Civil Rule 56(e) requires that an affidavit presented in response to a motion for summary judgment set forth specific facts showing that there is a genuine issue for trial. Mr. Gay's statement does not meet this standard.

Neither the interpretation of the contract term "actual cost" nor the nature of the fuel purchase transaction presents the court with a genuine issue of material fact. Therefore we conclude that the trial court erred in denying Husky's motion for summary judgment on the fuel charge issue, and we reverse. On remand the trial court must determine the amount owing to Husky for fuel overcharges by Seair.

### III. DID THE TRIAL COURT ERR IN DENYING HUSKY'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON THE FLIGHT CREW ISSUE?

■ Husky contends that the trial court erred when it denied Husky's motion JNOV on the augmented crew issue.

In reviewing the denial of a motion JNOV, this court is not to weigh conflicting evidence or judge the credibility of witnesses. *Mullen v. Christiansen,* 642 P.2d 1345, 1348 (Alaska 1982). Our task is instead to determine whether the evidence when viewed in the light most favorable to the non-moving party is such that reasonable persons could not differ in their judgment as to the facts. *Id.*

In this case the jury was to determine the reasonable expectations of Husky and Seair with respect to the term "augmented crew" and interpret the contract accordingly.

Contract TC–81–6 was formed after Seair responded to an invitation to bid. The contract lists specifications for the aircraft to be used. It states that Seair is to provide crews for the aircraft in accordance with the specifications and "the accepted standards and practices of the industry for work ... in the Arctic North Slope region of the State of Alaska."

The contract provides rates as follows:

| | |
|---|---|
| Daily Rate | $1,000.00 |
| Hourly Rate | $ 98.00 |
| 1,000 Gallon Tank Rental (monthly) | $ 400.00 |
| Augmented Crew Daily Rate | $ 420.00 |

The daily rate is the base rate for having the aircraft on site, and applies regardless of whether the aircraft flies on a given day. The hourly rate is the additional amount paid for each hour the aircraft is actually flying. The meaning of the augmented crew rate is disputed.

Seair consistently flew with a pilot and co-pilot, and billed Husky under the augmented crew provision when it did so. Husky refused to pay.

Husky contends that the term "augmented crew" denotes a second complete crew whose purpose is to extend the aircraft's flying time. Therefore, Husky argues, Seair should not be entitled to bill under the augmented crew provision unless it provides two complete crews for the purpose of extending flying time. Moreover, Husky contends Seair knew that Husky expected a pilot and co-pilot as standard crew on all flights.

Seair contends that the term "augmented crew" means simply double crew size or, in this case, one more crew member. It also contends that the requirements of the contract could be met by a pilot alone, and that it intended to use a pilot alone as crew under the contract. The contract in question does not specify any particular crew size, and Seair maintains that different air transportation companies provide different crew complements on North Slope contracts.

We find Seair's proposed definition of "augmented crew" untenable. The words "double crew size" are meaningless unless "crew size" is somehow determined. Given Husky's silence as to the required crew complement, only the undisclosed intention of the bidder could serve to define "crew size." Thus the bidder's undisclosed intention would determine the rate at which it would charge when flying with a pilot and co-pilot: those intending at the outset to use a pilot and a co-pilot would be entitled to charge merely the daily rate, while those intending at the outset to use a pilot alone could supplement their profits under the

augmented crew provision. If bidders were free to determine crew size as they wished, then "augmented crew" must have meant something other than "double crew size."

Moreover Seair does not offer any reasonable explanation of the purpose of the augmented crew provision. It simply maintains that an extra crew member would occasionally be required and that Husky would be billed for augmented crew on these occasions. This conflicts with Seair's insistence that the requirements of the contract could be met with a lone pilot. It also conflicts with Seair's practice under the contract of consistently flying with pilot and co-pilot.

The presence of the augmented crew provision can only be explained on the assumption that it meets some specific need. The great weight of the evidence compels the conclusion that this specific need is extended flying time. Numerous witnesses, including a former Seair pilot, testified that the term "augmented crew" refers to a second crew whose purpose is to extend flying time. Evidence was also presented that Seair had provided documentation of extended flying time when billing under similar provisions in past contracts. In addition, the contract rate for augmented crew is consistent with past contract rates under which an additional pilot and co-pilot were specifically to be provided.

We are satisfied that reasonable minds could not differ as to the reasonable expectations of the parties. Seair did not fly extended hours and is therefore not entitled to compensation under the augmented crew provision. The trial court's denial of Husky's motion for JNOV on the flight crew issue is reversed.[2]

The judgment of the superior court is REVERSED and the case is REMANDED to the superior court for proceedings consistent with this opinion.

2. Because the case is resolved on the grounds stated, other issues raised by Husky on appeal are not reached.