*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARVIN KOCUREK, | ) | |
| | ) | Supreme Court No. S-15829 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-06181 CI |
| vs. | ) | |
| | ) | O P I N I O N |
| RICHARD WAGNER, | ) | |
| | ) | No. 7155 – March 3, 2017 |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Jeffrey G. Pickett, Law Office of Jeffrey G. Pickett, Anchorage, for Appellant. No appearance by Appellee Richard Wagner.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Fabe, Justice, not participating.]

STOWERS, Chief Justice.

## I. INTRODUCTION

An artifact collector appeals a superior court's decision to deny his motion for a new trial and amendment of judgment where the jury found that a collection of artifacts from Zacatecas, Mexico,[1] had been wrongfully converted and awarded him

---

[1] The parties refer to the "Zacatecas Region" in their briefing, by which they likely mean the modern state and capital city of Zacatecas in central Mexico.

$5,000 in damages. He alleges that there was no evidentiary basis for the jury's damages award and that the superior court's reasons for denying his motion were erroneous. But because the superior court did not abuse its discretion by concluding that the jury's verdict was not against the weight of the evidence and because the facts do not require us to disturb the jury's verdict in the interests of justice, we affirm.

## A. Facts

In the early 1970s or mid-1980s, Marvin Kocurek purchased approximately 225 pre-Columbian artifacts from a mining engineer named Clayton R. Rasmussen. According to a handwritten note that Kocurek kept with the collection of artifacts, Rasmussen had acquired the artifacts in 1936 or 1937 near Zacatecas, Mexico, and received customs clearance to bring the collection into the United States in 1937. Kocurek's note does not indicate the amount he paid for the collection, but according to witness testimony at trial, he paid $50,000 for the collection in some combination of cash and trade.

Kocurek packed the artifacts with paper towels, toilet paper, and clothing in an ammunition box that he stored with his prized possessions at the bottom of a bedroom closet. The artifacts were rarely shown to anyone. Kocurek had the items photographed sometime during the 1980s but never had them appraised.

Kocurek's son, Eric Kocurek, assisted his father in managing some of Kocurek's personal finances and business affairs. In August 2011 Kocurek granted power of attorney to Eric. Cognitive assessments in April 2012 and April 2013 indicated that Kocurek had some problems with short-term memory, and in April 2012 Eric began the process of moving his father to Texas to live with family.

During the fall of 2012 Eric accepted an offer by Richard Wagner, who had been a business and personal acquaintance of Kocurek for several years, to help salvage and sell several pieces of scrap metal on Kocurek's Alaska property and to split the

profits. At some point while Wagner was working on the scrap project, he and Kocurek examined the collection of artifacts in the ammunition box. Wagner then called some friends in Arizona who were familiar with the antiquities trade and asked whether they knew anything about the value of a collection like Kocurek's. Through various connections, Wagner learned that a smaller collection of artifacts like Kocurek's had been confiscated by the Mexican government when the owner tried to sell it. Wagner relayed this information to Kocurek and suggested to Kocurek that "if the government finds out you have this stuff, they will take it." He also told Kocurek that his collection had significant value and offered to broker a deal with the United States State Department to get Kocurek a return on the money he had invested in the collection before it was confiscated or otherwise compromised.

At trial the parties disputed whether this conversation amounted to a contract between Kocurek and Wagner. Eric testified that he overheard the conversation and told Wagner that he and his father were not selling the artifacts. Wagner, however, testified that Kocurek asked him to help sell the artifacts after he told Kocurek about his plan to "dispose[] of" his own collection of artifacts. According to Wagner:

> I asked Marvin [Kocurek] what he was going to do with his large salvage yard of all these massive amounts of collectibles, and he didn't know. And he told me that his son had been trying to get him to sell the stuff off. And I said: Marvin, you can't take it with you. So he, in turn, asked me if I would help him. And I agreed to that.

After Kocurek and Wagner discussed the value and potential sale of Kocurek's artifacts, Wagner began to execute a convoluted plan to sell the collection without risking confiscation by the Mexican government. Kocurek and Wagner talked with one of Wagner's friends, Carlos Lopez, and together they devised a scheme to clandestinely ship Kocurek's collection to Mexico and then offer it for sale to the United

States government.  Wagner would broker the deal  through some attorneys he knew in Las Vegas.  Wagner asked his friend Roxy Weatherton to fly from Minnesota to Alaska at his expense to help him with his plan for Kocurek's artifacts.

One of the elements of the plan was that the government would buy Kocurek's collection for the amount Kocurek originally paid for it, with three-percent interest, compounded, over a 40-50 year period; this amounted to approximately $232,544.29.  Wagner asserted that the basic outline of the plan was drawn up in a written agreement that Kocurek and Wagner signed with Weatherton as the witness.  This alleged written contract was not available at trial.

Wagner testified that he generally followed the agreement with Kocurek.  In October 2012 Weatherton and Kocurek packed the artifact collection from Kocurek's ammunition box into a plastic Wal-Mart tote to disguise it.  Then the tote was put into a surplus People Mover bus and driven to the Port of Anchorage, where it was consigned to a barge sailing to the Port of Seattle.  At some point, Wagner and Weatherton took photographs of the collection in Anchorage for record-keeping purposes.

Wagner and Weatherton then met with Alan Mulliner, an attorney at Alverson, Taylor, Mortensen & Sanders, a Las Vegas law firm, about additional steps that Wagner needed to take to successfully execute his plan.  Wagner testified that he and Weatherton described the contract with Kocurek, provided Mulliner with a box of photographs that Kocurek had given to Wagner, and requested a copy of the notes that Mulliner had taken during their three-hour meeting.  Wagner then called Kocurek to tell him that "the plan was basically in motion."  Wagner retrieved the People Mover bus from the Port of Seattle and drove it to Mohave Valley, Arizona, where Wagner's friend Lopez met them. Lopez took possession of the bus to drive it across the border to Mexico, where, in accordance with Wagner's plan, he was to wait with it until Wagner

and his attorney had a deal with the United States State Department to purchase the artifacts.

In the meantime, Kocurek's family moved Kocurek to Texas to live with his sister Alice Kocurek. Wagner regularly updated Kocurek on his progress, and when Wagner called after Kocurek's move to Texas, he told Kocurek that he had not heard anything from the State Department. During this telephone call, Alice picked up the phone, demanding to know what Wagner was doing with the artifacts. After Wagner explained the plan, Alice said that she had a copy of the receipt that showed when Kocurek purchased the artifacts and told Wagner that Kocurek did not want to sell the items and that they wanted them back. According to Wagner, Alice said that the receipt was dated before the effective date of the Antiquities Act,[2] though she could not verify this at trial. Alice later testified that Wagner told her that the law firm in Las Vegas had the artifacts, a fact Wagner disputed. Wagner told Alice that he would return the collection but expected some compensation for assisting Kocurek with the plan to find a buyer for the artifacts. Wagner provided her with the contact information for the Las Vegas firm.

Around the same time, Eric hired a private investigator to try to find Lopez at an address in Mexico Wagner provided to him, but the investigator was unable to locate the town, Lopez, or the artifacts. Kocurek's collection was last accounted for in Mexico, and its location was unknown at the time of trial.

---

[2] There was some question as to whether the Antiquities Act of 1906 made the possession of the artifacts illegal. 16 U.S.C. § 431, *repealed by* Pub. L. 113-287, § 7, Dec. 19, 2014, 128 Stat. 3272. It was suggested that the artifacts were bought before the Act went into effect and therefore were legal to own and could legally be sold on the open market. However, the Act applied only to artifacts removed from U.S. soil, unlike the artifacts at issue in this case. *Id.* Therefore, it appears that the Act ultimately did not affect the outcome of this case.

From January to March 2013, Kocurek's Alaska attorney, Wayne Dawson, and Wagner's Las Vegas attorney, Mulliner, exchanged several letters about the artifacts. In one letter, Dawson asserted that Wagner had represented to Kocurek that the Las Vegas firm had possession of the artifacts and was trying to broker a sale of the items. He stated that the artifacts "have an appraised value in excess of $100,000" and requested that the firm protect the artifacts until Kocurek could make arrangements to have them returned to Alaska. He also asserted that Wagner removed the items from Kocurek's home without authorization. Mulliner responded to the letter, stating that "this law firm has never taken possession of specific artifacts belonging to Mr. Kocurek that originate from the Zacatecas Region of Mexico" and that he would discuss Dawson's letter — specifically the accusation that Wagner removed the items without permission — with Wagner.

A week later, on March 4, Mulliner sent a letter in which he disputed that his client took Kocurek's artifacts without permission and stated that Wagner had an agreement with Kocurek to "broker the sale of the artifacts in exchange for a 20% commission/finder's fee plus reimbursement for any and all expenses related thereto." The letter also stated that if Kocurek wanted to resolve the dispute "amicably," Wagner would accept a settlement payment from Kocurek "in the amount of $100,000[] . . . [which] represents the estimated commission from the sale of the artifacts plus related expenses." Dawson responded on March 12, 2013, asserting that Kocurek was an elderly man suffering from dementia and was unable to knowingly enter into the contract Wagner described. He demanded that Wagner provide evidence of his "status as a licensed and bonded dealer in antiquities" given Wagner's demand for the $100,000 commission payment. He also requested the location and insurance information for the

artifacts.  Having received no response to his letter, Kocurek filed suit against Wagner on April 3, 2013, in the Alaska Superior Court in Anchorage.[3]

### B.    Proceedings

The jury heard evidence about the value of Kocurek's collection over the course of a six-day trial, during which Wagner represented himself and participated telephonically.  The evidence included an estimate of the value of the artifact collection based on letters between Kocurek and the Las Vegas firm; testimony from both plaintiff and defense witnesses about what Kocurek allegedly paid for the artifacts; testimony from Kocurek's sister about valuation of four pieces from the collection at an Antiques Roadshow event; and a 2013 Sotheby's sales list and catalogue.

The March 4, 2013 letter from Mulliner to Dawson was read into evidence. The letter included the terms of the alleged agreement between Kocurek and Wagner, noting that Wagner was entitled to a "20% commission/finder's fee plus related expenses."  The letter also included the terms of Wagner's settlement offer:  "[Wagner] is willing to accept payment from Mr. Kocurek in the amount of $100,000.00.  This figure represents the estimated commission from the sale of the artifacts plus related expenses."  The March 12, 2013 letter from Dawson to Mulliner, which was also read into evidence, referenced the $100,000 commission:  "[B]ased upon your client's demand for payment of a $100,000 commission, please provide proof of Mr. Wagner's status as a licensed and bonded dealer in antiquities."

Eric testified that his father originally purchased the artifact collection for $15,000 in cash and that he was sure his father also traded "other items" for the collection; he had heard from others that his father paid $50,000.  He also compared

---

[3]    Eric filed the original complaint and this appeal through counsel in exercise of his power of attorney from his father.

photographs of his father's collection with a Sotheby's 2013 auction catalogue. Eric suggested that his father's collection had three pieces similar to those in the Sotheby's catalogue and that each of the Sotheby's artifacts sold at auction for an amount ranging from $12,000 to $350,000. Based on these comparisons, Eric testified that he estimated his father's collection to be worth "above a half million dollars," but he also admitted that he had not had the collection appraised before it was removed from Kocurek's house. Alice testified that sometime in 2000 Kocurek brought a "sampling" of his artifact collection on a visit to Texas and left 23 pieces with her for safekeeping. She later took four of these pieces to an Antiques Roadshow event, where she was told during a brief appraisal that the artifacts were "genuine" and dated between 900 BCE and 1400 CE.

Wagner testified that Kocurek paid $50,000 to purchase the artifacts. According to Wagner, the terms of his contract with Kocurek included a sale to the United States government with 3% interest, compounded, on the $50,000 principal, for the period that Kocurek owned the artifacts, with Wagner to receive a 20% commission plus expenses.

The court instructed the jury on its role as fact-finders, how to evaluate the evidence, the Antiquities Act of 1906, and legal cause. Addressing the jury's fact-finding role, the court explained: "You, as jurors, are the sole judges of the credibility of the witnesses. In deciding whether to believe a witness and how much weight to give a witness's testimony, you may consider anything that reasonably helps to evaluate the testimony." The court instructed the jury that "[i]f you decide that Richard Wagner interfered with Marvin Kocurek's right to possess the artifact collection without a legal excuse, you must decide . . . how much money will reasonably compensate Marvin Kocurek for the harm." The court explained that while Kocurek must prove damages, he "does not have to prove the exact amount of damages that will provide reasonable

compensation for the harm," and that the jury "must not speculate or guess in awarding damages."

The court explained that Kocurek would be entitled to the "fair market value of the pre-Columbian artifact collection at the time it was taken." The court gave the following instruction on the meaning of "fair market value":

> [I]magine that an owner of a property puts it up for sale and is allowed a reasonable time to sell it. The fair market value is the amount a fully informed seller would receive from a fully informed buyer in a normal open market sale. In arriving at this figure, you must assume that the owner would be free to sell or not to sell and the buyer would be free to buy or not to buy.

After deliberating, the jury issued a special verdict finding that Wagner interfered with Kocurek's right to possess the artifact collection without a legal excuse and that Kocurek was entitled damages. The jury found that Kocurek was entitled to $5,000 in damages. It did not award any punitive damages against Wagner. In December 2014 the court entered judgment in favor of Kocurek.

Kocurek moved for a new trial on the amount of damages and, alternatively, to amend the judgment.[4] He argued that the jury's $5,000 damage award was against the weight of the evidence because the evidence presented at trial by both the defendant and the plaintiff's witnesses valued Kocurek's collection between $175,000 to $500,000. Kocurek pointed to four specific valuations presented to the jury through evidence and testimony, all of which were well above $5,000: (1) Kocurek's testimony that he

---

[4]     Alaska Civil Rule 59(a) provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury or in an action tried without a jury, if required in the interests of justice." And Alaska Civil Rule 59(f) provides that "[a] motion to alter or amend the judgment shall be served not later than 10 days after the entry of the judgment."

originally purchased the artifact collection for $15,000 in cash and $35,000 in trade; (2) Wagner's testimony that Kocurek acquired the artifact collection for $50,000; (3) Wagner's demand for $100,000, representing the amount he would have received from his 20% commission on the sale of the collection and as compensation for his expenses and suggesting that the collection's total value was between $400,000 and $500,000; and (4) Wagner's testimony that Kocurek was going to be paid $50,000 plus 3% compounding interest for each year that he owned the collection, minus Wagner's brokerage costs and fees. Kocurek argued that the jury's $5,000 award resulted from "improper speculation" as to whether Kocurek possessed the artifacts "in violation of Mexican law" and requested that the court grant his motion for a partial new trial on the issue of damages, or alternatively, amend the judgment "to reflect the actual damages incurred by plaintiff pursuant to the evidence presented at trial."

The court denied Kocurek's motion, explaining:

> After independently weighing the evidence, the Court determines that the jury's verdict is not against the weight of the evidence. The jury was not convinced that the artifacts warranted a higher damage award. Evidence available to Plaintiff, but not presented to the jury, was a valuation of the artifacts in possession of Plaintiff's sister. The jury asked about this type of evidence during trial. A new trial is not warranted to allow Plaintiff the opportunity to restructure his case. No conduct on the part of the Defendant prevented Plaintiff from presenting stronger damages evidence.

> Plaintiff's Motion for a New Trial is DENIED. The Court also declines to amend the judgment.

Kocurek appeals. Wagner did not participate in the appeal.

## III. STANDARD OF REVIEW

Under Alaska Civil Rule 59(a), a superior court may grant a partial new trial after a jury verdict if required "in the interest of justice." Whether to grant a new

trial is within the discretion of the superior court, which "must use its discretion and independently weigh the evidence."[5] On review of a trial court's decision to deny a new trial, "we view the evidence in the light most favorable to the non-moving party"[6] and "will only reverse a decision to deny a new trial if the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust."[7] "Although the question whether the trial court applied the correct legal standard is a question of law that we review de novo, our review of the trial court's decision itself is considerably more deferential."[8] "When we review the substance of a trial court's denial of a new trial, as opposed to its interpretations of law, '[w]e will not interfere with the trial court's discretion except in the most exceptional circumstances and to prevent a miscarriage of justice.' "[9]

## IV. DISCUSSION

### A. The Superior Court Applied The Correct Legal Standard.

Kocurek disputes each of the court's reasons for denying his motion and argues that the court erred because it impermissibly hypothesized why the jury arrived at its damages award, rather than analyzing whether the jury heard evidence at trial sufficient to support its $5,000 damages award. But because the court's order expressly

---

[5]    *Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006) (quoting *Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1176 (Alaska 2002)).

[6]    *Hunter v. Philip Morris USA Inc.*, 364 P.3d 439, 447 (Alaska 2015) (quoting *Kava*, 48 P.3d at 1173).

[7]    *Id.* (quoting *Hogg*, 134 P.3d at 352).

[8]    *Hogg*, 134 P.3d at 352.

[9]    *Hunter*, 364 P.3d at 452 (alteration in original) (quoting *Mullen v. Christiansen*, 642 P.2d 1345, 1348 (Alaska 1982)).

states that it denied Kocurek's motion "[a]fter independently weighing the evidence," and because the court's rationale supporting this assertion reflects this standard, we conclude that the superior court conducted an appropriate analysis under the correct legal standard.

Kocurek argues that the jury's consideration of the evidence must have been improper because all the evidence regarding the valuation of his collection suggested values far higher than the $5,000 the jury awarded him. In support, Kocurek cites to testimony that Kocurek told Wagner that he originally purchased the collection for $50,000; testimony that Kocurek's agreement with Wagner was to sell his collection for $50,000 plus 3% interest, compounded, for the amount of time Kocurek owned the collection, approximating a value of $232,544; and evidence of Wagner's offer to return the artifacts for $100,000, which Kocurek argues implies a value of $500,000 based on Wagner's assertion that his contract with Kocurek included a 20% commission. Kocurek also asserts that Alice's testimony regarding the assessment of four pieces at an Antiques Roadshow event combined with Eric's comparisons of the collection with items listed in a 2013 Sotheby's catalogue compels a conclusion that the artifacts had a minimum value of $2,000,000.

A superior court may amend a judgment under Civil Rule 59(f) or grant a new trial under Civil Rule 59(a) "if required in the interest of justice." In *Hunter v. Philip Morris USA, Inc.*, we reaffirmed that when a party requests a new trial on the basis that the jury's verdict is against the weight of the evidence, trial courts should use the standard set forth in *Kava v. American Honda Motor Company*:

> a trial court may set aside a verdict and order a new trial in the interest of justice if the verdict is against the weight of the evidence. In deciding a motion for a new trial on this basis, the court must use its discretion and independently weigh the evidence. A court may set aside a verdict as being against the

weight of the evidence even when "there is substantial evidence to support it." The decision is a matter for the trial court's discretion.[10]

We have made clear that the standard used by a trial court when deciding a motion for a new trial on the grounds that the verdict is against the weight of the evidence is distinct from the standard of review used by the appellate court when reviewing a trial court's decision on a motion for new trial.[11] In *Hogg v. Raven Contractors, Inc.*, we clarified that when an appellate court reviews a trial court's denial of a new trial under Civil Rule 59, the question of "[w]hether the trial court applied the correct legal standard" is reviewed de novo, but that "our review of the trial court's decision itself is considerably more deferential."[12] "If there is an evidentiary basis for the jury's decision, denial of a new trial must be affirmed."[13]

Here, Kocurek moved for a partial new trial on the amount of damages and, alternatively, to amend judgment. In its order denying the motion, the court stated that "[a]fter independently weighing the evidence, [it concluded] that the jury's verdict is not against the weight of the evidence." The court reasoned that a new trial was not "warranted to allow Plaintiff the opportunity to restructure his case" and that Wagner had not prevented Kocurek "from presenting stronger damages evidence," demonstrating that the court considered whether a new trial was warranted in the interests of justice and exercised its discretion in deciding that it was not. The order shows that the court evaluated Kocurek's motion under the correct legal standard as set forth in *Kava*: the

---

[10]     *Id.* at 447 (quoting *Kava*, 48 P.3d at 1176).

[11]     *Id*. at 447, 449.

[12]     134 P.3d 349, 352 (Alaska 2006) (quoting *Kava*, 48 P.3d at 1173).

[13]     *Hunter*, 364 P.3d at 449 (quoting *Mullen*, 642 P.2d at 1348).

court "independently weigh[ed] the evidence" and used its discretion to not "set aside a verdict and order a new trial in the interests of justice [because] the verdict [was not] against the weight of the evidence."[14] We conclude that the trial court conducted a proper analysis under the correct legal standard.

**B.    The Superior Court Did Not Abuse Its Discretion Because, Viewing The Evidence In The Light Most Favorable To The Non-Moving Party, There Was An Evidentiary Basis For The Jury's Verdict.**

The essence of Kocurek's appeal is that Kocurek suffered damages as a result of Wagner's actions much greater than the $5,000 the jury awarded him and that there was no evidentiary basis for the jury's verdict.

When we review a superior court's decision to deny a "weight of the evidence" motion for a new trial, we utilize the standard of review expressed in *Mullen v. Christiansen*:

> A motion for a new trial will be granted when the evidence to support the verdict is so completely lacking or is so slight and unconvincing as to make the verdict plainly unreasonable and unjust. If there is an evidentiary basis for the jury's decision, denial of a new trial must be affirmed. We will not interfere with the trial court's discretion except in the most exceptional circumstances and to prevent a miscarriage of justice.[15]

In *Hunter*, we further clarified:

> In reviewing the substance of a trial court's order denying a new trial, we view the evidence in the light most favorable to the non-moving party, and "will only reverse a decision to deny a new trial if the evidence supporting the verdict was so

---

[14]    48 P.3d at 1176.

[15]    642 P.2d at 1348 (citations omitted); *see also Hunter*, 364 P.3d at 448-49.

completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust."[16]

In applying this standard of review to a superior court's denial of a new trial under Civil Rule 59, we have reversed superior court decisions where the jury failed to award *any* damages after returning a verdict that supported the essential elements of the tort. For instance, in *Pugliese v. Perdue*, we reversed the superior court's denial of a motion for a new trial where the only issue at trial was the amount of damages because the defendant admitted negligence, liability, and lack of comparative negligence in a negligence action.[17] The jury awarded the plaintiff nothing for his injuries and we held that a new trial was required because "a verdict finding that [plaintiff's] injuries resulted from some other traumatic cause would have required sheer speculation."[18] Similarly, in *Fancyboy v. Alaska Village Electric Co-op, Inc.*, we reversed a superior court's denial of a new trial where, in an incident involving a house fire that resulted in the death of the plaintiffs' child, the jury awarded damages only for property loss and for stipulated medical expenses even though there was no dispute that the plaintiffs had also shown non-economic damages.[19] We held that the jury's failure to award damages for the plaintiffs' burns and loss of consortium due to the death of one of their children was an

---

[16]    364 P.3d at 447 (first citing *Kava*, 48 P.3d at 1173, and then quoting *Hogg*, 134 P.3d at 352).

[17]    988 P.2d 577, 581-83 (Alaska 1999); *see also Kingery v. Barrett*, 249 P.3d 275, 284 (Alaska 2011) (restating our holding that "[i]nadequacy of a jury verdict can be grounds for a new trial in cases where negligence and causation are conceded or proved, but no damages are awarded").

[18]    *Pugliese*, 988 P.2d at 582.

[19]    984 P.2d 1128, 1135-36 (Alaska 1999).

"inconsistent" verdict and a new trial was "required in the interest of justice" under Civil Rule 59.[20]

But we have declined to reverse a superior court's denial of a motion for a new trial where "the evidence 'does not necessarily establish' that [defendant's] negligence was the cause of [plaintiff's] injuries"[21] and where the testimony or evidence was conflicting.[22] In such decisions, we have also considered the jury's role in weighing the credibility of witnesses and testimony.[23] For instance, in *Richey v. Oen* we affirmed a superior court's denial of an "against the weight of evidence" motion for a new trial, explaining that the jury is entitled to discount testimony and make credibility determinations: "Jurors are entitled to disbelieve a witness or otherwise discount a witness's testimony. Such credibility determinations made by the jury are generally left undisturbed by this court on review."[24]

We find this last point to be significant in this case. Kocurek fails to account for the jury's role in making credibility determinations. Instead, he spends a significant amount of his brief discussing speculative damages and burdens of proof and

---

[20]    *Id.*

[21]    *Kingery*, 249 P.3d at 284 (quoting *Hogg*, 134 P.3d at 353). In *Hogg*, we affirmed the superior court's denial of a motion for a new trial where the jury had determined that the defendant had been negligent but that the defendant's negligence was not the cause of the plaintiff's injuries. 134 P.3d at 353.

[22]    *See Richey v. Oen*, 824 P.2d 1371, 1376 (Alaska 1992) ("In the face of conflicting testimony, the jury determined that [the plaintiff] suffered no injuries as a result of the accident."); *Kingery*, 249 P.3d at 284 ("[I]f conflicting evidence about causation exists we will not reverse the superior court's denial of a motion for a new trial following a verdict for the defendant.").

[23]    *See Richey*, 824 P.2d at 1376.

[24]    *Id.* (citations omitted).

arguing that he presented evidence sufficient to meet these standards. He also fails to account for several key considerations. For example, the jury was specifically instructed on the issue of speculative damages. The court told the jury that while Kocurek must prove damages, he "does not have to prove the exact amount of damages that will provide reasonable compensation for the harm," and that the jury "must not speculate or guess in awarding damages." Kocurek finally fails to discuss why there is no evidentiary basis for the verdict in light of the fact that he received some damages, as opposed to zero damages. He also fails to give effect to our deferential standard of review.

While it is true that nothing in the record suggests that the collection was worth exactly $5,000, the relevant question for us is not whether there was evidence of this specific amount but whether there was an evidentiary basis for the jury's award in light of the jury's responsibility to make its own credibility determinations. Here, the bulk of the evidence regarding the value of Kocurek's collection was speculative or reflected calculations of value that the jury was not required to accept. We also note that the superior court heard and saw the same witnesses and evidence that the jury did and undoubtedly reached its own conclusions about the credibility of the testimony and evidence. Given the lack of evidence of credible appraisals or a written agreement between the parties, the jury had to rely primarily on the oral testimony of witnesses, and the jury was not required to believe any of them. The jury could permissibly have rejected all of the estimates and valuations but still have concluded the collection was worth something. We conclude that the superior court did not abuse its discretion in denying Kocurek's motion because, viewing the evidence in the light most favorable to Wagner, there was an evidentiary basis for the jury's award and none of the superior

court's alleged errors meet the threshold for "exceptional circumstances" that require our intervention to "prevent a miscarriage of justice."[25]

## V.     CONCLUSION

We AFFIRM the superior court's decision denying Kocurek's motion for a new trial or to amend the judgment.

---

[25]     *Fancyboy*, 984 P.2d at 1135 n.28 (quoting *Sebring v. Colver*, 649 P.2d 932, 934 (Alaska 1982)); *see also Pugliese*, 988 P.2d at 581-83.